**John CAPPIELLO, Petitioner,**

*v.*

**Robert HOKE, Superintendent Eastern Correctional Facility, and The State of New York, Respondents.**

**No. CV 87–0831.**

United States District Court,
E.D. New York.

Jan. 7, 1988.

Bennett M. Epstein, New York City, for petitioner (Isabelle A. Kirschner, of counsel).

Elizabeth Holtzman, Dist. Atty. of Kings County, Brooklyn, N.Y. by Michael Gore, Asst. Dist. Atty., for respondents.

## MEMORANDUM AND ORDER

RAGGI, District Judge:

John Cappiello petitions this court for a writ of habeas corpus pursuant to 28 U.S. C. Section 2254. Presently serving two concurrent terms of fifteen years to life imprisonment for his July 9, 1979 conviction on two counts of felony murder, Cap-

piello alleges violations of his constitutional rights insofar as certain inculpatory statements were used against him at trial. Specifically, Cappiello argues that he was arrested without probable cause in violation of the Fourth Amendment and that his subsequent inculpatory statements, as the "fruits" of this arrest, should have been suppressed. He further claims that, insofar as trial counsel failed to challenge the validity of his arrest, he was denied his Sixth Amendment right to effective assistance of counsel. Finally, Cappiello complains that his inculpatory statements were coerced in violation of his rights under the Fifth, Sixth and Fourteenth Amendments. The state responds that petitioner is barred from presenting his Fourth and Sixth Amendment claims and that his claim of coercion is without merit. For the reasons set forth below the petition is dismissed.

*Factual Background*

1. *Introduction*

On August 10, 1976, Joseph and Angelina Tucci were the victims of a robbery in their Brooklyn home. In the course thereof, each was bound, gagged and brutally murdered, sustaining multiple skull fractures and lacerations of the brain as a result of beatings with a blunt instrument. A hammer was found near the dead body of Mrs. Tucci; an axe next to that of her husband.

2. *Neighbor's Observations at The Tucci Home*

On the morning of August 10, 1976, a neighbor, Lorraine Frasca, noted a green station wagon parked a few houses down the street from the Tucci home. A youth, whom she would later describe as having light brown curly hair styled in a medium "Afro", a description that apparently fit John Cappiello, was seated in the back. Within a few minutes, Mrs. Frasca saw two other youths emerge from an alleyway alongside the Tucci home, enter the green station wagon and drive off. Her suspicions aroused, Mrs. Frasca noted the license plate number.

Two days later, a relative discovered the slain bodies of Joseph and Angelina Tucci in their ransacked home and notified the police.

The following day, August 13, 1976, having learned of the murders from news reports, Lorraine Frasca contacted the police and related what she had seen at the Tucci home, giving a detailed description of the two individuals who emerged from the alleyway, a more general description of the individual in the car, and the car's license plate number. Detective Andrew Kilcullen traced the license plate to Mary Santanella of Brooklyn.

3. *Police Meet with Mrs. Santanella*

When Detective Kilcullen met with Mrs. Santanella on August 14, 1976, he confirmed her ownership of the green station wagon. More significantly, he learned that her son, Ralph Santanella, was recently missing. From Mrs. Santanella and other neighborhood contacts, Detective Kilcullen obtained a list of Ralph Santanella's friends, including petitioner, John Cappiello, and Anthony Tamilio.

4. *Police Meet with Tamilio*

Detective Kilcullen went that same day to interview Anthony Tamilio at his father's nursery business. Although Tamilio was not technically a "suspect" at this time, Detective Kilcullen did think he might be one of the persons Mrs. Frasca had seen at the Tucci home. Asked about Santanella, Tamilio volunteered that he had last seen him the previous Tuesday [August 10, 1976] when the two had been driving around with John Cappiello.

Detective Kilcullen then asked Tamilio to accompany him to the police station for further questioning. Kilcullen testified that he generally conducted interviews in his office at the police station. Tamilio's father, who had recently arrived on the scene, told the detective that his son had work to do for him and that he would bring him to the station later that day. Kilcullen relied on the elder Tamilio's representation and, making the strategic decision not to reveal his investigation of the Tucci mur-

ders at this time, did not pursue the matter further.

### 5. *Police Meet with Cappiello at His Home*

Instead, Detective Kilcullen and another officer went to the Cappiello home, arriving in the mid-afternoon of August 14, 1976. Met first by Cappiello's parents, the officers asked for John and spoke privately with him in the family living room regarding the whereabouts of Ralph Santanella. According to Detective Kilcullen, Cappiello asked his parents to leave the living room when he spoke to the officers as he did not wish them to be upset. According to Mrs. Cappiello, it was the officers who asked them to leave, noting that young .people often did not like to speak in front of their parents.

Cappiello acknowledged knowing Santanella and Tamilio but did not give a specific time when he was last with them. The officers did not tell Cappiello they were investigating the Tucci homicide, nor did they ask any questions about the station wagon. Although Detective Kilcullen did not consider Cappiello a "suspect" at this time, he did suspect the eighteen-year old of having some involvement in the crime under investigation. Accordingly, he asked Cappiello to accompany him to the station for further questioning. Mrs. Cappiello claimed that the police never said they were taking petitioner to the police station. Instead, she claims they represented they were taking him to look for Santanella.

They agree that the elder Cappiellos asked if they could accompany the officers. Detective Kilcullen told them they could not. He says he gave them the precinct number and address; Mrs. Cappiello disputes this. According to Mrs. Cappiello when she and her husband asked if their son was in trouble, the officers replied, "not that we know of." They promised to return him to his home when they completed the search for Santanella. According to Detective Kilcullen, petitioner's father offered to drive his son to the police station. The detective told him he could not do this, but indicated he could follow.

Detective Kilcullen did not consider Cappiello "under arrest" at this time. Certainly nothing was said about an arrest. But had Cappiello sought to go anywhere but with the officers, Kilcullen would not have permitted him to do so. As Kilcullen explained, "the pieces were starting to come together in my mind and I was going to make my move." By this he meant "interrogate, investigate, and then depending on what answers you get from people, you arrest him or you turn him loose and start all over again."

### 6. *Cappiello's First Inculpatory Statement*

En route to the police station, the two officers continued their discussions with Cappiello, who spoke little. Arriving at the station at approximately 3:45 p.m., Cappiello was advised of his rights, although no mention was made that he was under arrest. For approximately three hours, Detective Kilcullen sought to persuade Cappiello to cooperate. Since Kilcullen assumed Cappiello was the person seen sitting in the station wagon by Mrs. Frasca and not one of the youths emerging from the Tucci alleyway, he did not think Cappiello had actually been in the victims' house. Accordingly, he urged him to "help himself" by telling "the truth." He warned that prison terms as high as 25 years to life were involved if a person were convicted of the crimes under investigation.

At approximately 7:00 p.m., Cappiello made his first statement to the authorities. He told Kilcullen that sometime between 9:30 and 10:00 a.m. on August 10, 1976, Anthony Tamilio had come to his home. Tamilio owed Cappiello $1400, and on August 10 said he might be able to pay it back. Cappiello went with Tamilio and Ralph Santanella in a green station wagon to pick up some cement pots from a man who was a good friend of Tamilio's father. Tamilio said he knew the man had money because he wore an expensive ring and because Tamilio's father had recently given him $500.

When they arrived at their location, Tamilio told Cappiello to stay in the car. As

Tamilio and Santanella got out of the car, Cappiello saw Tamilio with a length of clothesline in a jacket he was carrying. Ten to fifteen minutes later the two returned without any money, saying that things had gotten "loused up" and that people had to be tied up and knocked out. As they drove away, Tamilio went through papers and discarded some out the window.

Cappiello was then dropped off at his home. He did not see Tamilio again until August 12, 1976. Tamilio cautioned him not to talk about the earlier events to insure no one got in trouble. He saw Santanella on August 13, 1976, by which time the murders had been reported in the newspapers. Santanella denied any participation in the killings and advised Cappiello that nothing would happen if everyone kept quiet.

### 7. Cappiello's Second Inculpatory Statement

After taking the first statement from Cappiello, Detective Kilcullen contacted Assistant District Attorney Marc Schultz who came to the station. Cappiello was advised of his rights by Schultz and a recorded statement was taken from him at 9:04 p.m. In this statement, in addition to the admissions already made to Kilcullen, Cappiello stated that he too had gone into the Tucci home, though some minutes after his confederates. He knew "something was up" and had "an idea" the Tuccis were going to be robbed. He was to assist in the robbery.

When Cappiello entered the house, Joseph Tucci was already tied up in the basement with tape around his mouth. The robbers then went upstairs where Cappiello told Angelina Tucci her husband wanted her. When she emerged, Tamilio took her in the kitchen and began to tie and tape her up. Seeing that Mrs. Tucci was scared and crying, Cappiello decided to leave and went back to the car. Subsequently, in his statement, Cappiello admitted to opening a few drawers in the Tucci living room, although he did not respond when asked if he had found anything. He denied seeing any blood in the house and insisted both Tuccis

were alive when he left. He had seen an axe and a hammer in the basement but denied seeing anyone touch them.

When Santanella and Tamilio returned to the car, Tamilio threw out a number of papers, including a bank passbook in Angelina Tucci's name. They then drove Cappiello home.

In concluding his statement, Cappiello indicated that he was speaking voluntarily. He did not respond when asked if he had been forced in any way to give the statement, but answered "Right" when asked if he was making the statement of his own free will. He again did not respond when questioned as to whether he had been well treated at the station, but denied being threatened or having had any promises made.

Sometime after this statement was given, Cappiello's father and uncle, a New York City police officer, arrived at the station and met with Cappiello. Also at some time that evening, and under circumstances not clear from the record before this court, a friend of Cappiello's, Russell Cunningham, was interviewed at the station about inculpatory statements Cappiello had made to him.

According to Mrs. Cappiello, it was Russell Cunningham who came to her house and told the parents where their son was. Until then, they had been calling different precincts trying to locate him. Once Cunningham told them the station number, Mr. Cappiello telephoned and was told to come down, but not to bring his wife. Detective Kilcullen did not recall speaking to the Cappiellos from the station, but stated that the petitioner did request, and was allowed, to make telephone calls while at the station. Although Kilcullen said he did not know whom Cappiello called, he assumed he spoke to his parents.

### 8. Cappiello's Third Inculpatory Statement

After the Cunningham interview, Detective Kilcullen told Cappiello's father and uncle that he wished to question petitioner further. Once the relatives had stepped outside, Kilcullen again advised Cappiello

of his rights. Thereafter, Cappiello admitted going into the Tucci home on August 10, 1976. When he went through drawers in the home, he found three bank books and a man's diamond ring. Later that day, Tamilio and Cappiello went to a branch of the Dime Savings Bank in Brooklyn to withdraw money from one of the Tucci accounts. They were unsuccessful.[1] The next day, Cappiello attempted to sell the Tucci ring at the New York Jewelry Exchange, but claims the man to whom he gave it never returned the item.

### 9. Cappiello's Fourth Inculpatory Statement

At 10:59 p.m., Cappiello was again questioned in a recorded interview by ADA Schultz. Schultz gave Cappiello his rights for the fourth time that day. Thereafter, Cappiello acknowledged knowing Russell Cunningham and having told him of a plan to rob an old person's house. He might have asked Cunningham to participate, but the latter refused.

Cappiello admitted that on the evening of the murder he told Cunningham what had occurred at the Tucci home. Cappiello further admitted to Schultz that he had seen Tamilio strike Angelina Tucci in the head with his hand to make her "shut up." He denied ever seeing Tamilio use a hammer or gun on the victims. When asked how Cunningham could know that a hammer had been used, Cappiello did not answer. Later in his statement, he said Cunningham must have misunderstood him and insisted that he had not seen a hammer or axe used on the victims.

Cappiello acknowledged telling Cunningham that the robbers had taken a bankbook and a ring and showing Cunningham the ring. He detailed for Schultz the unsuccessful efforts at the bank and Jewelry Exchange to reap the proceeds of the criminal efforts.

Before leaving the station the night of August 14, 1976, ADA Schultz authorized the formal arrest of John Cappiello.

### Procedural History

#### 1. Cappiello's First Trial

Cappiello, along with co-defendants, Anthony Tamilio and Ralph Santanella, was charged with two counts of felony-murder, robbery, burglary and other related crimes involved in the August 10, 1976 deaths of Joseph and Angelina Tucci.

Prior to trial, Cappiello's attorney moved to suppress his station-house confessions as impermissibly coerced. A hearing was conducted at which Detective Kilcullen, ADA Schultz, a court reporter and petitioner's mother testified. Trial counsel questioned each witness vigorously and at length, bringing to the court's attention the full circumstances under which Cappiello had made his inculpatory statements. The defendant's youth, the circumstances under which he had been removed from his parents' home—characterized as aimed to lull him into thinking he was not in any trouble—the length of time he was kept at the station without contact with family, and the officer's statements about maximum incarceration, were all relied upon to argue that the inculpatory statements had been coerced in violation of Cappiello's Fifth Amendment rights and should, therefore, be suppressed. The trial court, without making findings of fact, ruled the statements were "voluntary" and refused to suppress them.

Petitioner was convicted after a jury trial of two counts of felony-murder. Upon this conviction, petitioner was sentenced by Justice Dominic Rinaldi, Supreme Court, Kings County, to two concurrent terms of twenty-five years to life in state prison.

On May 28, 1978 the Appellate Division, Second Department, reversed the foregoing

---

1. Apparently, as the Tuccis lay dead in their home, Tamilio and Cappiello made two attempts to withdraw $2500 from an account the victims had at the Dime Savings Bank. As recounted by bank employees, who would subsequently view line-ups and make identifications, it was Cappiello, accompanied by Tamilio, who first presented the Tucci passbook and a forged note identifying himself as Tucci's nephew. When the signature on the forged authorization note failed to match the signature on the bank's record card, the withdrawal request was denied. Tamilio subsequently approached another teller at the same branch with the same result.

conviction and remanded the case for a new trial because of an incorrect instruction as to an affirmative defense to the felony murder charge. N.Y.Penal Law Section 125.25(3). *People v. Santanella*, 63 A.D.2d 744, 405 N.Y.S.2d 284 (1978).[2] On this appeal, Cappiello, represented by new counsel, had argued that his incriminating statements should have been suppressed on Fourth Amendment grounds as the products of an illegal arrest as well as the Fifth Amendment grounds that had been raised before the trial court. He requested a supplemental suppression hearing to present this Fourth Amendment claim. The appellate court denied the request, finding Cappiello's argument that the trial court had erroneously denied his motion to suppress the inculpatory statements to be "without merit." *Id.* 63 A.D.2d at 747, 405 N.Y.S. at 288.

### 2. *Cappiello's Second Trial*

On July 9, 1979, Cappiello was again convicted of two counts of felony-murder after a non-jury trial at which he took the stand. Judge John R. Starkey, Supreme Court, Kings County, found Cappiello to have been a knowing participant in the robbery and therefore guilty of all the lesser offenses charged. With respect to the homicide, Judge Starkey found that, even if he were to assume that the first three elements of the affirmative defense set forth in N.Y.Penal Law 125.25 were satisfied, Cappiello had failed to satisfy the fourth, *i.e.*, he had failed to demonstrate that he had no reasonable ground to believe that his confederates intended to engage in conduct likely to result in death or serious injury. In making this finding, Judge Starkey relied on evidence that Cappiello knew Tamilio was known to the murder victim. Under the circumstances, the likelihood of death or serious injury was found to exist.

Cappiello here contends that the only evidentiary support for this finding is Cappiello's first statement to Detective Kilcullen

that Joseph Tucci made cement pots for Tamilio's father, and that Tamilio knew the intended victim had a lot of money in his house. Most of the other statements that Cappiello made to the police regarding the robbery and murders were also testified to by friends to whom Cappiello had made admissions. Apparently, however, it was only to Kilcullen that Cappiello related the link between Tamilio and the Tuccis.

On this second conviction for felony murder, Cappiello was given a lesser sentence of concurrent terms of fifteen years to life. It is this term that he is presently serving.

On December 7, 1981, the Appellate Division affirmed Cappiello's second conviction. *People v. Cappiello*, 85 A.D.2d 608, 444 N.Y.S.2d 681 (1981). In his second appeal, petitioner again raised his Fourth Amendment claim, relying on the then-recently decided case of *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The Appellate Division held that *Dunaway* would be applied retroactively only in cases where the Fourth Amendment issue had been raised in some manner at the trial level. "If no Fourth Amendment issue was effectively raised at *nisi prius*, any argument with respect thereto, including *Dunaway*, is deemed waived." 85 A.D. 2d at 608, 444 N.Y.S.2d at 682.

On March 2, 1982, leave to appeal to the Court of Appeals of the State of New York was denied. *People v. Cappiello*, 56 N.Y. 2d 595, 450 N.Y.S.2d 1029, 435 N.E.2d 1102 (1982).

In June, 1983, Cappiello moved for re-argument. In addition to raising his Fourth Amendment claim and again requesting a supplemental hearing, he argued that any waiver of his Fourth Amendment rights at the initial suppression hearing was the product of ineffective counsel, and as such, a violation of his Sixth Amendment rights. On July 7, 1983, the Appellate Division denied reargument.

---

**2.** Also reversed on the same ground was the conviction of Ralph Santanella. The conviction of Anthony Tamilio, who had not relied on the statutory affirmative defense was affirmed.

The denial of his petition for habeas corpus relief is reported at *Tamilio v. Fogg*, 713 F.2d 18 (2d Cir.1983), *cert. denied*, 464 U.S. 1041, 104 S.Ct. 706, 79 L.Ed.2d 170 (1984).

### 3. The State Habeas Proceeding

Pursuant to C.P.L. 440.10, Cappiello then moved in December, 1983 for an order vacating his conviction, alleging denial of his Sixth Amendment right to effective assistance of counsel. Justice Thaddeus E. Owens, Supreme Court, Kings County, denied the motion without a hearing on April 25, 1984 on the dual grounds that it was barred by Section 440.10(2)(c), requiring dismissal of matters that could be raised on appeal, and that, in any event, the claim of ineffective assistance of counsel was without merit. Leave to appeal to the Appellate Division, Second Department, was denied on February 4, 1985 on the procedural ground.

A subsequent similar motion, brought *pro se* pursuant to C.P.L. Section 440.10, was denied on April 4, 1986, and leave to appeal was denied without opinion on June 4, 1986.

### 4. The Federal Habeas Petition

On January 26, 1987, petitioner filed the instant petition for habeas corpus relief. The case was initially assigned to Judge Broderick of the Southern District of New York, from whom it was transferred to Judge Platt of the Eastern District of New York, from whom it was here transferred.

Petitioner asserts that he has adequately exhausted state remedies for all his claims. The state, in opposition to the petition, does not contest this point. Upon review of the record the court finds that petitioner has exhausted his state remedies regarding all of his constitutional claims.

### DISCUSSION

#### I. Fourth Amendment Claim

In considering Cappiello's claim that his inculpatory statements to the authorities should have been suppressed as the "fruit" of an unlawful arrest, the court is mindful that in *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court erected a substantial barrier to federal habeas review of Fourth Amendment claims:

[W]here the state has provided an opportunity for full and fair litigation of the Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

*Id.* 428 U.S. at 481–82, 96 S.Ct. at 3046. Thus, this court has "no authority" to grant the writ of habeas corpus simply because it may disagree with the result of a state court on a Fourth Amendment question. *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir.1977) (*en banc*), *cert. denied*, 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed. 2d 787 (1978); *Foran v. Metz*, 463 F.Supp. 1088, 1092–93 (S.D.N.Y.), *aff'd*, 603 F.2d 212 (2d Cir)., *cert. denied*, 444 U.S. 830, 100 S.Ct. 58, 62 L.Ed.2d 38 (1979) (federal court may not characterize erroneous outcome of state court procedure as "unfair" in order to reach a Fourth Amendment claim). Before this court can reach petitioner's Fourth Amendment claim, it must first find that the state has not provided an opportunity for full and fair litigation of the claim. The focus of the inquiry is necessarily on the word "opportunity." *McPhail v. Warden, Attica Correctional Facility*, 707 F.2d 67, 69 (2d Cir.1983); *Shaw v. Scully*, 654 F.Supp. 859, 863 (S.D.N.Y.1987).

Where the state has provided an opportunity fully and fairly to litigate Fourth Amendment claims by enacting a statutory mechanism for the suppression of evidence obtained by unlawful search and seizure, the federal courts may not re-examine those issues on habeas corpus review. *McPhail v. Warden, Attica Correctional Facility*, 707 F.2d at 69. In this case, N.Y.Crim.Proc.Law Article 710 clearly provided Cappiello with the opportunity to move for the suppression of evidence prior to trial. *Id.* Indeed, Cappiello availed himself of this procedure in seeking to suppress his inculpatory statements on Fifth Amendment grounds. Thus, Cappiello does not—and indeed could not—argue that New York failed to provide him with even the "opportunity" to move for the suppression of evidence based on a Fourth Amendment claim.

Instead, he complains that there was an "unconscionable breakdown" in the otherwise adequate state process. *Gates v. Henderson,* 568 F.2d at 840 (where state provides a process to redress constitutional deprivations, but defendant precluded from using it because of an unconscionable breakdown in that process, federal habeas review may be warranted). Specifically, Cappiello argues that it was such a breakdown that prevented him from obtaining review of his Fourth Amendment claim.

As the suppression hearing transcript makes clear, the thrust of Cappiello's argument with respect to his inculpatory statements was that they were involuntary and therefore, taken in violation of the Fifth Amendment. Nevertheless, at the close of his oral argument, Cappiello's counsel did characterize the case as a "classic Won San situation," presumably relying on *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), in which the Supreme Court suppressed evidence, including oral statements, that were the "fruits" of an unlawful arrest. While this raises the possibility that the Fourth Amendment claim was somehow being relied on before the trial court, when the citation of *Wong Sun* is considered in context, it seems more directed to the proposition that Cappiello's subsequent inculpatory statements were the "fruits" of his first allegedly involuntary statement, such that, if the court found the first statement to have been taken in violation of the Fifth Amendment, the subsequent statements must also be suppressed.

The Appellate Division panel that considered Cappiello's first conviction, and his more plainly articulated Fourth Amendment claim, did not discuss whether this claim of unlawful arrest had or had not been presented to the trial court. It simply found all the arguments as to suppression to be "without merit" and refused to order a new hearing.

The Appellate Division panel that considered Cappiello's second conviction expressly found that the Fourth Amendment claim had *not* been presented to the trial court at the suppression hearing. For this

reason, it refused to apply *Dunaway* retroactively. *People v. Cappiello,* 85 A.D.2d at 608, 444 N.Y.S.2d at 682.

In this context, the "breakdown", of which petitioner complains is that the first Appellate Division panel erred in refusing to order a new hearing on his Fourth Amendment claim and that, as a result, the second Appellate Division panel erred in not applying *Dunaway* to his case.

 This is not the sort of "breakdown" referred to in *Gates.* Rather, the Court of Appeals there cited as an example the circumstances in *Frank v. Mangum,* 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1915), wherein, over the dissents of Justices Holmes and Hughes, the Supreme Court refused to grant a writ of habeas corpus to a petitioner convicted of murder in a state trial claimed to have been dominated by an angry mob. It also cited to a law review article, Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners,* 76 Harv.L.Rev. 441, 456–57 (1963) in which situations such as the bribing of a trial judge, the government's knowing use of perjured testimony, or the use of torture to extract a guilty plea, all without opportunity to obtain state review, are cited as circumstances justifying habeas inquiry. *See Allah v. LeFevre,* 623 F.Supp. 987, 991 (S.D.N.Y.1985). In short an unconscionable breakdown in the state's process must be one that calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society.

In this case, the most of which petitioner can complain is that the first Appellate Division panel, having reached the merits of his Fourth Amendment claim—although it may not have been obliged to do so given his failure to raise it below—purportedly ruled incorrectly, thereby depriving him of a second chance to make the sort of trial record which, because of his failure to make it at his initial opportunity, deprived him of the retroactive applicability of *Dunaway.*

As already noted, it is not for this court to review the correctness of the first Appel-

late Division panel's determination on the merits of Cappiello's Fourth Amendment claim. *Gates v. Henderson,* 568 F.2d at 840.

Moreover, the court cannot say that it is an "unconscionable breakdown" of the state's process that a litigant, who fails to raise a claim when he is initially given an opportunity for full and fair review, is not afforded a *second* chance to attack the same evidence on a different legal theory. Nor is such a breakdown evidenced by a failure to afford such a litigant the retroactive application of subsequent law.

There having been no "unconscionable breakdown" in New York's procedure for hearing arguments to suppress evidence, the court declines to consider the merits of Cappiello's Fourth Amendment claim.

## II. Petitioner's Sixth Amendment Claim

Cappiello argues that any failure to raise a Fourth Amendment claim at his initial suppression hearing was attributable to the ineffectiveness of his trial counsel, thereby stating a separate claim under the Sixth Amendment. In *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed. 2d 305 (1986), the Supreme Court held that a petition for habeas corpus premised on a Sixth Amendment claim of ineffectiveness of counsel is not limited by *Stone v. Powell, supra,* even where the alleged ineffectiveness concerns a motion based on alleged Fourth Amendment violations. Nevertheless, in this case, a procedural default at the state court level bars federal review. Moreover, were this court to reach the merits it would find against petitioner.

### A. *The Procedural Default*

As already noted, petitioner's claim of ineffective assistance of counsel was first raised in a motion to the Appellate Division for reargument of his appeal. This motion was denied without opinion. Cappiello pursued the claim in a motion to vacate his conviction under C.P.L. Section 440.10(1)(h). This motion was denied, in part because the Sixth Amendment issue could have been, but was not raised on direct appeal. C.P.L. Section 440.10(2)(c). Cappiello's motion for leave to appeal this decision was denied,

with the Appellate Division also specifically ruling that the "claim of ineffective assistance of counsel could have been raised in defendant's direct appeal from the judgment." Petitioner, proceeding *pro se,* renewed the Sixth Amendment claim in a second unsuccessful 440.10 motion.

Where a petitioner has failed to abide by a state's procedural rules for the litigation of a constitutional claim, he may not obtain federal habeas relief absent a showing of "cause and actual prejudice". *Reed v. Ross,* 468 U.S. 1, 11, 104 S.Ct. 2901, 2908, 82 L.Ed.2d 1 (1984); *see Wainwright v. Sykes,* 433 U.S. 72, 86–87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). In *Reed v. Ross, supra,* the Court specifically found the failure to comply with rules requiring issues to be raised on direct appeal, as opposed to post-conviction collateral review, to constitute procedural default. *Id.* 468 U.S. at 11, 104 S.Ct. at 2908.

■ Petitioner argues here, as he did unsuccessfully in state court, that his Sixth Amendment claim of ineffective assistance of counsel was properly presented to the state court under C.P.L. 440.10. Therefore, he asserts, the doctrine of procedural default should not apply. In effect, petitioner urges this court to find, despite the explicit rulings of two New York courts that he was procedurally barred from raising collaterally what could have been raised on direct appeal, that the state courts were in error and he has not in fact defaulted.

This the court declines to do. Quite apart from the comity concerns that would warrant against a federal court ruling as petitioner suggests, the merits of his argument are dubious. Section 440.10(2)(c) mandates dismissal when the record is sufficiently developed to allow review of a claim on appeal. *See People v. Cooks,* 67 N.Y.2d 100, 103, 500 N.Y.S.2d 503, 491 N.E.2d 676 (1986) (defendant who successfully pursues a claim under Section 440.10 must nevertheless raise it on direct appeal where factual record for review is adequate or risk dismissal under 440.10(2)). Although a claim of ineffectiveness of counsel may not "generally" be demonstra-

ble on the main record on appeal, this is not universally true. *E.g. People v. Satterfield*, 66 N.Y.2d 796, 497 N.Y.S.2d 903, 488 N.E.2d 834 (1985); *People v. Brown*, 45 N.Y.2d 852, 410 N.Y.S.2d 287, 382 N.E.2d 1149 (1978). Indeed, had Cappiello been granted leave to reargue his appeal, he was apparently prepared to base his ineffectiveness claim on the then-existing record. Only when the motion to reargue was denied did he, in 1983, some seven years after the suppression hearing, first invoke Section 440.10 to attack the competency of his counsel. But the very purpose of the mandatory dismissal provisions of 440.10(2) is to prevent the section from being a substitute for direct appeal when a defendant was in a position to raise the issue in that manner. *See People v. Cooks, supra.* Accordingly, absent a showing of "cause and prejudice" for the default, federal review of the claim of ineffective counsel is inappropriate.

### B. *Cause and Prejudice*

■ Petitioner's failure to raise the claim of ineffective assistance of counsel on direct appeal can only be attributed to one of two factors: (1) inadvertence or ignorance by appellate counsel; (2) deliberate appellate strategy. Neither factor suffices to establish "cause" for a procedural default. As the Supreme Court expressly held in *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), "[t]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Id.* at 486, 106 S.Ct. at 2644. Further, "default of a constitutional claim by counsel pursuant to a trial strategy or tactical decision would, absent extraordinary circumstances, bind the habeas petitioner even if he had not personally waived that claim." *Id.*, at 485, 106 S.Ct. at 2644. Instead, as the Court explained, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can

show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," as for example where "the factual or legal basis for a claim was not reasonably available to counsel," or where some official interference made compliance impracticable. *Id.* at 488, 106 S.Ct. at 2646. There being no such external factor to which the procedural default in this case can be attributed, the "cause" prerequisite for federal review is not satisfied.[3]

■ Even assuming "cause" could be shown for petitioner's failure to raise his claim of ineffective counsel on direct appeal, Cappiello would still have to establish "prejudice" to overcome his procedural default. *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976) (Both cause and prejudice must be demonstrated). To satisfy the prejudice prong, petitioner must show not merely a possibility of prejudice, but that the alleged error worked to his "actual and substantial disadvantage." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed. 2d 816 (1982). Naturally, petitioner's procedural default of his claim of ineffective trial counsel is prejudicial only if such claim is meritorious. For the reasons stated below, the court finds such claim to be without merit, and therefore no prejudice to exist.

### C. *The Alleged Ineffectiveness of Trial Counsel*

To sustain a claim of ineffective assistance of counsel, petitioner must show: (1) that counsel's performance was so unreasonable under prevailing professional norms that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); and (2) that counsel's ineffectiveness prejudiced the defendant such that "there is a reason-

---

**3.** *Murray v. Carrier* does make clear that a showing of constitutionally ineffective counsel, under the standard established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), would satisfy the cause

prong of the *Wainwright* test. Petitioner, however, does not allege that his counsel *on appeal*, was ineffective, nor has he presented any such claim to the state courts for their review. 106 S.Ct. at 2646.

able probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* 466 U.S. at 694, 104 S.Ct. at 2068. *Accord United States v. Nersesian,* 824 F.2d 1294, 1322 (2d Cir., 1987). In assessing the performance of counsel, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'." *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). Paramount to the court's consideration of any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* 466 U.S. at 686, 104 S.Ct. at 2064.

■ The thrust of Cappiello's argument that he was denied effective assistance of counsel concerns his trial counsel's failure to invoke the Fourth Amendment and challenge admission of his inculpatory statements as the "fruit" of an unlawful arrest.

This claim must be considered in the context of a record that otherwise demonstrates Cappiello's trial counsel to have been a forceful and determined advocate for his client.[4] *Kimmelman v. Morrison,* 106 S.Ct. at 2589 (generally appropriate to consider counsel's overall performance in assessing an alleged omission). Every witness called at the suppression hearing, which sought to preclude in court identifications as well as to suppress statements, was questioned vigorously insofar as the testimony given related to Cappiello. In this way, a number of facts were developed to support the argument that petitioner's

incriminatory statements were involuntary and the witness identifications unreliable.

This is not a case, therefore, where trial counsel completely failed to make a critical motion. *See Kimmelman v. Morrison, supra.* Rather, it is a case where counsel did not invoke an alternative ground for a motion he was already pursuing. In considering whether the failure to invoke the Fourth, as well as the Fifth Amendment, in urging suppression of Cappiello's inculpatory statements, constitutes ineffectiveness of counsel, the court recognizes that counsel need not file every possible motion, but only those having a "solid foundation." *United States v. Nersesian, supra,* at 1322. Moreover, the court is mindful that its perspective in considering counsel's conduct cannot be the present—when a custodial investigation must clearly be supported by probable cause—but rather the time over ten years ago when the suppression hearing actually occurred. *See Kimmelman v. Morrison,* 106 S.Ct. at 2586.

In 1977, there was serious reason to think custodial interrogation might be tolerated on less than probable cause. In 1969, in *Morales v. State of New York,* 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed.2d 299 (1969), the Supreme Court chose "not to grapple with the question of the legality of custodial questioning on less than probable cause for a full-fledged arrest." *Id.* 396 U.S. at 105–06, 90 S.Ct. at 293. Indeed, it would not do so until *Dunaway v. New York,* 442 U.S. at 200, 99 S.Ct. at 2248, ten years later.

In *Morales,* an individual brought to a police precinct for questioning confessed within fifteen minutes to a murder. The New York Court of Appeals, in affirming the conviction, expressly rejected the argument that such detention had to be supported by probable cause. *People v. Morales,* 22 N.Y.2d 55, 290 N.Y.S.2d 898, 238

---

4. Cappiello makes much of his trial counsel's unsuccessful request for an extension of time as evidence of his lack of preparedness to go forward. In context, this request relates not at all to the suppression hearing, but rather to the fact that the government had only that morning turned over certain evidence to be offered at trial about which counsel sought to make further inquiry. In any case, given that the suppression hearing commenced on April 13, 1977 and concluded on April 18, 1977, with an intervening weekend before counsel had to argue to the court, it cannot be said that Cappiello's counsel was denied the reasonable time necessary to develop legal arguments to support his suppression motion.

N.E.2d 307 (1968). Rather, in cases "involving a serious crime" the police were authorized to detain "for a reasonable and brief period of time for questioning under carefully controlled conditions protecting ... Fifth and Sixth Amendment rights ... those persons reasonably suspected of possessing knowledge of the crime under investigation ..." *Id.* at 64–65, 290 N.Y.S. 2d 898, 238 N.E.2d 307.[5] In light of this ruling, and in view of circumstances that certainly gave rise to reasonable suspicion that Cappiello possessed knowledge of the Tucci robbery/murder, it is easy to understand why counsel premised his suppression motion on the Fifth rather than Fourth Amendment.

In 1975, the Supreme Court did decide *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), in which it suppressed a confession obtained as the result of a formal arrest that lacked probable cause. The Court found the arrest to have been "investigatory," an "expedition for evidence in the hope that something might turn up." *Id.* 422 U.S. at 605, 95 S.Ct. at 2262. While such language might have appeared to cast doubt on the continued viability of *Morales,* this court is hardly prepared to say that Cappiello's counsel's failure to rely on *Brown* to support a Fourth Amendment claim evidenced ineffective assistance, particularly in light of the New York Court of Appeals distinguishment of *Brown* two months after the Cappiello suppression hearing. *People v. Morales,* 42 N.Y.2d 129, 136, 397 N.Y.S.2d 587, 366 N.E.2d 248 (1977). (*Morales* II)

*Morales* II resulted from the Supreme Court's remand of *Morales v. State of New York, supra,* to consider whether probable cause in fact existed to support the custodial detention. The close question was decided affirmatively by the hearing court and negatively by the Appellate Division. The Court of Appeals did not find the Appellate Division conclusion erroneous as a matter of law. *People v. Morales,* 42 N.Y.2d at 135, 397 N.Y.S.2d 587, 366 N.E.2d 248. Nevertheless, it adhered "fully to the views articulated in our prior opinion in this case" permitting custodial interrogation on less than probable cause. *Id.* As for the Supreme Court decision in *Brown,* "the basic distinction is that the arrest in *Brown* was illegal; the limited detention of Morales was not." *Id.* 42 N.Y.2d at 136, 397 N.Y. S.2d 587, 366 N.E.2d 248.

In this legal context and in view of the record as a whole, the court cannot say that in New York in 1977 a motion to suppress Cappiello's statements premised on the Fourth Amendment had a "solid foundation", *United States v. Nersesian, supra,* nor that trial counsel's failure to so argue rendered his representation of Cappiello ineffective. *C.f. Engle v. Isaac,* 456 U.S. 107, 134–35, 102 S.Ct. 1558, 1575–76, 71 L.Ed.2d 783.[6]

■ In light of the court's finding that counsel's performance was reasonable, it need not reach the question whether petitioner suffered prejudice from the alleged error. *Strickland v. Washington,* 466 U.S. at 697, 104 S.Ct. at 2069 ("There is no reason for a court deciding an ineffective assistance claim to ... address both components of the inquiry if the defendant makes an insufficient showing on one.") Nevertheless, the court finds prejudice not to have been established given the real possibility that probable cause for the arrest might have been demonstrated.

---

5. Although the *Morales* detention was less than an hour, whereas Cappiello's was closer to seven hours, the New York Court in *Morales* was quick to cite *United States v. Vita,* 294 F.2d 524 (2d Cir.1961), *cert. denied,* 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962), in which a suspect was detained between four and five hours prior to arrest.

6. Although this case is concerned primarily with the question of state procedural default, it is significant to note that in requiring a constitutional claim to be made whenever a legal basis is available for purposes of preserving the issue for subsequent federal habeas review, the Supreme Court nevertheless recognized that not every defense counsel will recognize or raise every conceivable claim, particularly in areas of some legal ambiguity, and that a failure to do so does not establish incompetence. *Engle v. Isaac, supra.* Similarly, in *Murray v. Carrier, supra,* the court suggests that failing to recognize the legal basis for a claim is not always the equivalent of ineffectiveness of counsel. 106 S.Ct. 2645–46.

Probable cause does not, after all, require a finding of "substantial probability" that a person committed a crime, nor even a conclusion that such is "more likely than not true." *United States v. Gotti*, 794 F.2d 773, 777 (2d Cir.1986) (*quoting Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (Rehnquist, J.) (plurality opinion) and *United States v. Contreras*, 776 F.2d 51, 53 (2d Cir.1985)). Rather, it requires an objective analysis of whether the facts available to the officers were sufficient to warrant a man of reasonable caution to conclude that an offense has been committed. *United States v. Cruz*, 834 F.2d 47, 50–51 (2d Cir.1987); *United States v. Gotti, supra.*

At the time John Cappiello was taken into custody police authorities already knew (1) that a green station wagon had been parked near the Tucci home on the day of the murder and that a neighbor, who had seen two men emerge from the alleyway next to the house to join a third in the car, was sufficiently suspicious of their activities to note the car's license plate. Moreover, from talking with Anthony Tamilio, who fit the physical description given by the neighbor of one of the men in the Tucci alleyway, police knew (2) that the three persons in the green station wagon on the date of the murder were, in all probability, Tamilio, John Cappiello and Ralph Santanella. The presence of individuals at or near the location of a crime at and about the time the crime was committed is some evidence of participation in the criminal conduct. *See United States v. Fox*, 788 F.2d 905 (2d Cir.1986) (observation of truck near drug dealer's residence just before planned sale of cocaine and truck's return to suspected source location, sufficient to establish probable cause to arrest driver for drug trafficking).[7] Further, the police conversation with Santanella's mother revealed that (3) within 48 hours of the Tucci murder, her son, one of the occu-

pants of the green station wagon, had disappeared. A suspect's actions that suggest a "consciousness of wrongdoing"—and certainly Santanella's flight amply supports such an inference—can contribute to a finding of probable cause, *United States v. Cruz, supra*, at 51. Moreover, when viewed in a practical, commonsense manner, the inference to be drawn from Santanella's flight is relevant to probable cause as to his likely confederates, Tamilio and Cappiello, as well.

Had the question of probable cause been squarely presented at the suppression hearing in this case it is possible other relevant evidence could have been adduced, notably, exactly what Lorraine Frasca saw to make her suspicious enough to note a license plate number, albeit not suspicious enough immediately to call the police, and whether she communicated these observations to the police. More significant perhaps is how and when on August 14, 1976 the authorities learned that Cappiello had made incriminating statements to Russell Cunningham. Although Cunningham apparently made his formal statement to the police on August 14, 1976 after Cappiello was already at the station, unless he just walked in and volunteered this information —an unlikely scenario—other occurrences earlier in the day must have led police to learn of Cappiello's devastatingly inculpatory statements to his friend. What these were and who knew about them at what time would be relevant to the issue of probable cause. *See United States v. Cruz, supra*, at 50–51 (probable cause can be based on collective knowledge of agents in communication with one another).

But reconstruction of events some eleven years after their occurrence is precisely one of the difficulties that led to the decision in *Stone v. Powell* to limit federal habeas review of Fourth Amendment claims. Moreover, it has led Justice Pow-

---

**7.** *See also Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) wherein police conducted custodial interrogation of an individual whose mother's truck had been seen near the house of a murder victim at the time of the crime and who fit the description of the person whom the crime witnesses had seen near the

truck and home shortly before the murder. The Court, limiting its discussion to a possible Fifth Amendment violation, made not even a passing reference to the possibility that the detention violated Fourth Amendment rights, although it had decided *Dunaway* only fifteen days earlier.

ell, in his concurring opinion in *Kimmelman v. Morrison,* 106 S.Ct. at 2594, to question whether the admission of reliable evidence, even if illegally procured, can ever constitute prejudice under *Strickland.*[8]

In this light, the court finds petitioner not to have established the requisite prejudice to support his claim that trial counsel was ineffective.

Having thus failed to establish either cause or prejudice for his failure to raise his Sixth Amendment claim on direct appeal to the New York courts, Cappiello is procedurally barred from asserting his claim of ineffective assistance of counsel as a basis for federal habeas relief. In any case, the claim having no merit, it is dismissed.

### III. Cappiello's Fifth, Sixth and Fourteenth Amendment Claims

■ Cappiello contends that the circumstances under which he made his four inculpatory statements to the authorities on August 14, 1976 violated his rights under the Fifth, Sixth and Fourteenth Amendments. Specifically he notes that he was only 18–years old when taken from his parents home to the police station. There, after being given *Miranda* warnings, he was questioned for a period of approximately seven hours. After some preliminary exchanges, during which the police warned him that he faced a jail term as long as 25 years to life if convicted of murder and urged him to "help himself" by telling the truth, Cappiello made his first statement some three hours after arriving at the station. He would receive *Miranda* warnings again before each of his three subsequent statements. He would see and talk to his father and uncle, a police officer, before making his last two, most detailed, statements. He apparently had access to the telephone during his time at the police station.

In considering petitioner's claim of coercion, the court must consider "whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *United States v. Mast,* 735 F.2d 745, 749 (2d Cir.1984) (quoting *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 751, 5 L.Ed.2d 760 (1961)). Among the factors to be considered are the "type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation." *Id.*

In this case, the court concludes that Cappiello's admissions were knowingly and freely made. The court is, of course, not the first to consider the voluntariness of Cappiello's admissions. The matter was fully litigated at the 1977 suppression hearing at which the court had the opportunity to assess the *demeanor and credibility of* the police officer and Assistant District Attorney to whom Cappiello made his statements. Implicit in the trial court's statement that it was considering all the evidence in reaching its conclusion, and not just the testimony of Mrs. Cappiello, is a finding that the police officer and Assistant District Attorney were credible witnesses.

The court further notes that New York law, like federal law, *see* 18 U.S.C. Section 3501, allows the question of voluntariness to be argued to the factfinder at trial. C.P.L. Section 710.70; *see People v. Graham,* 55 N.Y.2d 144, 447 N.Y.S.2d 918, 919, 432 N.E.2d 790, 791 (1982). The guilty verdicts at both trials, the first before a jury and the second to a judge other than the one who conducted the suppression hearing, strongly support the inference that on two more occasions the admissions were considered voluntary. Indeed, at the second trial, the judge had the opportunity to hear from Cappiello himself and apparently discounted his claim that he only agreed to a version of events put forward by authorities who had been screaming at him. A review of Cappiello's trial testimo-

---

**8.** The reliability of Cappiello's admissions to authorities is beyond question given the similar, if not identical, admissions he made to various friends, and the substantially similar admissions of his co-defendants.

ny does raise serious questions as to his credibility.

The two verbatim transcriptions of Cappiello's admissions certainly confirm that he was not mindlessly agreeing to a version of events to please his interrogators. Rather, after being advised of his rights and acknowledging that he understood them, he provided an often detailed version of the events of August 10, 1977. On occasion he related particulars obviously not known to the authorities, as for example, when he admitted his own presence in the Tucci home during the robbery. Such a detailed account is hardly consistent with his contention of just "yesing" the police. More significant, however, the record indicates that Cappiello was perfectly capable of disagreeing with his interrogators when necessary. He repeatedly denied ever seeing anyone use an axe or hammer to strike the Tuccis when probing questions were posed in this regard. This refusal to adopt all suggestions put forward by the authorities only supports the voluntariness of those statements actually made.

■ Addressing some of Cappiello's particular complaints, the court notes that admissions are not involuntary merely because they are in response to requests for cooperation. *Fare v. Michael C.*, 442 U.S. at 727, 99 S.Ct. at 2573 (no coercion when police tell 16–year old suspect in murder investigation that a cooperative attitude would be to his benefit); *United States v. Pomares*, 499 F.2d 1220, 1221–22 (2d Cir.), *cert. denied*, 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974). Although Cappiello was advised of the maximum penalty in New York for murder, no promises were made to him to induce his statements. *See United States v. Pomares, supra.* There is no evidence that he was subjected to any threats, physical coercion or trickery. *Id.* at 1222. Although the length of time Cappiello was at the police station was not inconsiderable, the court cannot conclude simply from the fact that three hours passed before Cappiello made his first in-

culpatory statement that his statement was involuntary. *See generally*, 18 U.S.C. Section 3501(c) (finding of voluntariness is possible if admission made within six hours of arrest or detention; thereafter court must find reasonable ground for delay in arraigning defendant).

Cappiello relies on *Gallegos v. Colorado*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) as further support for his claim that his admissions were involuntary and may also have been taken in violation of the Sixth and Fourteenth Amendment. *Gallegos* involved a 14–year old defendant, secluded for five days of interrogation, in the course of which, after advice of rights, he made inculpatory statements. The Supreme Court, reviewing the totality of circumstances, including the defendant's youth, the long detention with no appearance before a judicial officer, his mother's unsuccessful attempt to see him on the second day of his detention, and the failure to have advice of counsel, found the confession to have been obtained in violation of due process.

The totality of circumstances in this case is very different. An 18 year old high school graduate is not a 14 year old. Nothing in the record suggests that Cappiello was of below average intelligence or particularly naive.[9] To the contrary, the transcribed admissions support treatment of Cappiello as the adult he was. Similarly, seven hours at a police station with access to a telephone and, after at most five hours, contact with one's father and police officer uncle, is not analogous to five days in a juvenile detention center with access to no one.

Having considered the facts and circumstances surrounding Cappiello's four inculpatory admissions to authorities, the court finds no violation of petitioner's Fifth, Sixth or Fourteenth Amendment rights. Accordingly, petitioner's Fifth, Sixth and Fourteenth Amendment claims are dismissed.

---

9. The trial record indicates that at the time Cappiello was a recent high school graduate. Formerly the captain of his football team, Cap-

piello, the oldest of the three defendants, worked out at a gym the summer of the crimes at issue.

## CONCLUSION

The court, having found petitioner's Fourth Amendment claim and related Sixth Amendment claim of ineffective assistance of counsel barred from federal habeas review, the Sixth Amendment claim in any case to be without merit, and petitioner's Fifth, Sixth and Fourteenth Amendment claims as to the circumstances under which his inculpatory admissions were made to be without merit, it hereby dismisses the petition for a writ of habeas corpus.

SO ORDERED.