Perry BELLAMY, Petitioner,

v.

William COGDELL, Warden, Brooklyn House of Detention, Respondent.

No. CV 90–4245(RR).

United States District Court, E.D. New York.

June 28, 1991.

## MEMORANDUM AND ORDER

RAGGI, District Judge:

Perry Bellamy was convicted after a jury trial in Queens County of murder in the second degree, N.Y. Penal Law § 125.25 (McKinney 1987), and criminal possession of a weapon in the second degree, N.Y. Penal Law § 265.03 (McKinney 1987). Presently serving concurrent terms of incarceration of fifteen years to life and five to fifteen years respectively, Bellamy petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1988), claiming ineffective assistance of trial counsel and denial of due process. This court has reviewed the record of proceedings and finds the claim to be without merit. Accordingly, the petition is dismissed.

### Background

#### 1. The Murder of Brian Rooney

Sometime in 1985, Lorenzo "Fat Cat" Nichols, one of the most notorious drug dealers in Queens,[1] was arrested and incarcerated for violating his parole, largely as a result of the efforts of New York State Parole Officer Brian Rooney. From his jail cell Nichols vowed revenge. He ordered Rooney killed by two of his lieutenants, Howard "Pappy" Mason and Chris Williams. The "contract" was performed on the evening of October 10, 1985. Rooney was lured to the vicinity of Baisley Park in Queens by the petitioner, Perry Bellamy, who received $5,000 for his role in the crime. There, Mason and Williams, driving a green Datsun, approached Rooney's vehicle. Mason drew a gun and fired repeatedly until the officer lay dead.

#### 2. Suppression Hearing

Bellamy inculpated himself in the Rooney murder in three statements made to the authorities on October 25, 1985. His retained counsel, Sidney Guran, moved to suppress the statements on grounds that they were coerced by police authorities. Guran contended that his client was held in

Meyer, Suozzi, English & Klein, P.C., Mineola, N.Y. by Michael Ciaffa, for petitioner.

Richard Brown, Queens County Dist. Atty., Kew Gardens, N.Y. by Seymour Roth, Asst. Dist. Atty., for respondent.

---

1. In 1989, Nichols pleaded guilty in this district to two counts of racketeering and is awaiting sentence.

police custody for over twelve hours, that during that time he was not advised of his rights, not permitted to make any telephone calls, and not given adequate food or drink. Under such circumstances, his statements could not be deemed voluntary.

The trial court found otherwise, crediting the evidence adduced by the prosecution. Detective James Waddell testified that he had learned from an informant that petitioner had information pertinent to the Rooney murder. Waddell knew that Bellamy had cooperated with authorities in other contexts, even testifying in one drug case on behalf of the prosecution. Accordingly, at approximately 11:30 a.m. on October 25, 1985, he approached Bellamy on the street in Jamaica, Queens and asked him to accompany him to the police precinct. Bellamy agreed.

At the 113th precinct, Bellamy was asked to wait in a room generally used by police officers as a dormitory when they are spending the night at the station. Shortly thereafter, Bellamy was questioned by Sergeant Robert Plansker, who testified that he considered Bellamy a potential witness rather than a suspect, and free to leave had he wished to do so. Nevertheless, Plansker stated that he advised Bellamy of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before beginning the interview since he did not know where petitioner's information would lead.

Petitioner told Plansker that on the day of the murder, he had flagged down Rooney's car and warned the officer that there was a contract out on his life. Rooney asked Bellamy to get in his car, whereupon they proceeded to the area of Sutphin Boulevard. Soon thereafter, petitioner saw a Datsun 280Z driven by Chris Williams approach. Pappy Mason, who was sitting in the passenger seat, drew a gun and fired repeatedly at Rooney. Bellamy jumped out of the car and fled into Baisley Park.

Given the significance of Bellamy's statement, Plansker told petitioner he would likely be considered a material witness. He further advised Bellamy that the authorities would be willing to put him up in a hotel to assure his safety.[2]

Bellamy remained in the 113th precinct dormitory for the next several hours, occasionally dozing on the cots. At approximately 8:00 p.m., he was escorted to the office of the Queens District Attorney in order to make a videotaped statement. Prior to doing so, Bellamy was again interviewed, this time by Detective Bernard Steffen, who advised him of his rights before asking him to recount the events of the murder. In this second statement, Bellamy implicated himself more directly in the crime, stating that several weeks before the shooting, while in the Queens House of Detention, he had overheard Nichols cursing his parole officer and stating "he's going to get what's coming to him." On October 9, 1985, the day before the murder, Bellamy was told by one of Nichols' associates "to go meet this PO" at a specific location in Queens. The next day, Bellamy was present when that same individual placed a telephone call to Rooney telling him to meet petitioner on Sutphin Boulevard. When Bellamy met Rooney at the assigned spot, the officer asked where the individual was who had placed the call. Bellamy directed Rooney to a location near Baisley Park. There Mason shot him dead. Mason then ordered Bellamy to get into the car and threatened his life and that of his family if Bellamy ever revealed what he knew of the murder.

Thereafter, at approximately 11:30 p.m., Bellamy repeated the same statement on videotape after once again being advised of his rights, this time by an assistant district attorney.[3] He was then taken to the Marriott Hotel in Queens where, under guard,

---

**2.** At trial, it was revealed that Bellamy had previously spent five days in a hotel under police guard when he testified as a prosecution witness against Daniel Staley, another Queens drug dealer with a propensity for violence.

**3.** The court has not been provided with either the videotape or a transcript. A review of the entire trial record, however, suggests that this third version of events was substantially similar to the second.

he spent the night along with other potential witnesses.

The next evening, after his statements were reviewed by supervisors in the district attorney's office, Bellamy was arrested and formally charged with aiding and abetting the murder of Brian Rooney.

In a memorandum dated June 26, 1986, the trial court denied the suppression motion, finding from the totality of circumstances that Bellamy was not in custody at the time he made any of the three statements at issue. To the contrary, the court found that he remained free to leave throughout the evening and night of October 25, 1985. The court further denied suppression based on its finding that Bellamy was properly advised of his rights before any police questioning, voluntarily waived those rights, and voluntarily made statements to the authorities. *People v. Bellamy*, Ind. No. 5382–85 (Queens Co., Sup.Ct. June 26, 1986).

### 3. *Trial*

Over the course of the three-week trial, the prosecution offered, in addition to evidence establishing the death of Officer Rooney and Bellamy's statements to the authorities, another statement made by petitioner to Larry Robinson, with whom he was housed on Rikers Island while awaiting trial. Robinson testified that Bellamy had admitted his participation in the Rooney murder, stating that he had assisted in the crime because he needed money and acknowledging receipt of $5,000 for his efforts.

Defense counsel moved for a mistrial or the striking of Robinson's testimony on the ground that it had been procured in violation of Bellamy's sixth amendment right to counsel as set forth in *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). The prosecution opposed the motion, arguing that Robinson's testimony made clear that he had not been acting under police direction in procuring the statement. To the contrary, the evidence showed that Robinson "reached out" for the authorities only after conversing with

petitioner. The trial court denied the defense motion.

An affirmative defense case was presented to the jury through the testimony of five witnesses. These included Assistant District Attorney Daniel McCarthy, who confirmed Bellamy's significant cooperation in the prosecution of Daniel Staley; Captain Louis Fisher of the New York City Corrections Department, who testified to the limited access Larry Robinson had to Bellamy while the two were housed near each other on Rikers Island; Robert McCray, a witness to the Rooney shooting who could not identify Bellamy as one of the persons on the scene; and Annie Bellamy, petitioner's mother.

The critical defense witness, however, was Perry Bellamy himself. He admitted being with Brian Rooney the night the officer met his death, but explained that it was Rooney who approached him, soliciting his testimony at Nichols' parole violation hearing. He was driving with Rooney to Nichols' sister's home when Pappy Mason shot the officer dead. At the sound of the gunfire, Bellamy fled the scene.

Bellamy further admitted having overheard Nichols put out a contract on Rooney some time before the shooting. He claimed to have conveyed this information to a Detective Cunihan. Indeed, Bellamy claimed to have called Cunihan again three days after the shooting. That officer promised to get back in touch with him. In fact, he did not do so.

Bellamy denied voluntarily accompanying any police officers on October 25, 1985. He stated that the police threatened to "take him" if he did not accompany them peacefully. He claimed to have been strip-searched at the police precinct and to have been questioned by, on occasion, as many as ten officials. He denied ever being advised of his rights. Moreover, he stated that his requests to speak to ADA McCarthy, his lawyer and his mother were ignored.

Bellamy further denied ever telling Larry Robinson that he had assisted in the Rooney homicide. He did admit talking with Robinson, but testified that their con-

versation related to his decision to accept a $5,000 bribe being offered to insure that he did not testify against any of the Nichols crew.

The evidence adduced by the defense, both from its own witnesses and through cross-examination of prosecution witnesses, permitted counsel to argue cogently on Bellamy's behalf that it was simply incredible to think that Nichols and his crew, in plotting the death of a law enforcement officer, would rely on an individual well-known for having already cooperated with the prosecution to help them with their plan. Counsel urged the jury to discount Bellamy's own statements to the authorities as the unreliable product of both subtle and direct pressure exerted by members of a police department that, having ignored Bellamy's warning that Rooney was in danger, needed to make him a scapegoat to cover up its own ineptitude. Larry Robinson's testimony was dismissed as that of an incarcerated felon eager to say anything to curry favor with the authorities.

The jury's resolution of the case was by no means easy. Only after five days of deliberation did it return its verdict of guilty.

#### 4. Guran Disciplinary Proceedings

In the months immediately preceding and throughout the Bellamy trial, petitioner's counsel, Sidney Guran, was the subject of disciplinary proceedings before the First Department. He was formally charged with professional misconduct by the Departmental Disciplinary Committee on October 20, 1986, in connection with his alleged 1976 conversion of client funds to his own use and his alleged 1977 negligent handling of a real estate transaction, including the unauthorized signing of his client's name to a legal document. Guran was called upon to address these charges at a scheduled hearing.

On November 10, 1986, Guran's counsel, Richard L. Baltimore, requested an adjournment stating that more time was needed to compile documents and that Mr. Guran "is not mentally capable of preparing for the hearing." This latter claim was

supported by (1) counsel's representation that in telephone conversations with his 72-year old client—who was then living in Orlando, Florida—"I find a certain amount of disorientation," and (2) a "To whom it may concern" letter from Guran's New York physician, Dr. Richard P. Cohen, detailing his patient's various ailments. All of these were physiological in origin, including progressive polyneuropathy, a condition characterized by peripheral motor weakness and unsteadiness, for which Guran had been undergoing evaluation for the preceding six weeks. The doctor did note, in connection with this ailment, that Guran suffered "at times" from "an inability to concentrate." Indeed, given the prescribed medications and the "severe physical and emotional stress" resulting from the condition, the doctor stated that Guran "has been affected emotionally and physically, and has been virtually incapacitated over the last six to eight weeks." Moreover, he estimated that evaluation and treatment of this problem "will take at least three to six months, and that Mr. Guran will be effectively incapacitated during that time."

In light of this submission, as well as the underlying charges, the Disciplinary Commission, on November 21, 1986, petitioned the First Department to suspend Guran indefinitely from the further practice of law.

In response and opposition, Guran himself submitted an affidavit to the court dated December 12, 1986. Therein he stated that there was no need for suspension since he was in essence retired, having taken on no new work since 1984 with the exception of the defense of Perry Bellamy. Guran explained that he had represented Bellamy in the past and had the client's trust. Guran stated:

I, of course, will not attempt to try this case by myself. I will have a competent attorney, but I must be present to assist him. Bellamy relies on, and strictly trusts only me and his mother has paid me. It would be a complete disservice to this defendant and jeopardize his right to a fair trial if I were not permitted to assist in his trial and defense.

No response was forthcoming from either the Disciplinary Committee or the First Department for several months.

On December 11, 1986, Guran did advise the trial judge assigned the *Bellamy* case, in an *ex parte* submission, of the disciplinary charges pending against him and the subsequent motion to suspend him until such time as he was healthy enough to respond thereto. Guran explained that he had opposed suspension as unnecessary in light of his virtual retirement. As to his representation of Bellamy, he reported feeling "better" and advised that he had "secured the services of Marvin D. Skedelsky, Esq." to assist him in the trial. He did state that if he himself could not participate in the trial, Skedelsky would not be prepared to go forward on the scheduled trial date. Although Guran noted that he had spoken with the prosecutor about the matter, the record does not indicate that he ever spoke to his client. Indeed, both petitioner and his mother subsequently submitted affidavits to the contrary.

At trial, Guran represented Bellamy without the assistance of any other attorney.

On March 26, 1987, the Appellate Division, First Department, suspended Sidney Guran from the further practice of law. No hearing was conducted on the underlying charges. Instead, the basis for suspension was Guran's own representation that he was not mentally capable of preparing for a hearing, a representation that "implicitly concedes that he is, at this time, incapable of practicing law." *In the Matter of Sidney J. Guran*, 126 A.D.2d 216, 513 N.Y.S.2d 402 (1st Dep't 1987).

5. *State Court Challenges to the Competency of Trial Counsel*

a. *Sentencing*

Petitioner first challenged the competency of his trial counsel at sentence on April 16, 1987.[4] Speaking on his own behalf, Bellamy advised the court: "Mr. Guran

was not a fit lawyer to ... represent me properly because of his medical health and other reasons." The court initially refused to adjourn the case, sentencing defendant to a term of fifteen years to life on the murder charge and five to fifteen years on the firearms charge. That same day, the court vacated sentence and advised Bellamy that it would appoint new counsel for him.

b. *440 Motion*

On June 15, 1987, counsel moved to set aside Bellamy's conviction on grounds of ineffective assistance of trial counsel and denial of due process. N.Y.Crim.Proc.Law § 440.10(1)(a) and (h) (McKinney 1983). The factual and legal bases for this motion are identical to those pursued on this petition.[5]

The motion was summarily denied on July 30, 1987 and petitioner sentenced to twenty-five years to life incarceration on the murder count. Upon Bellamy's request for reconsideration, the court, on September 14, 1987, ordered a hearing to determine the competency of trial counsel.

The principal witness at this hearing was Dr. Richard P. Cohen, a specialist in internal medicine. He confirmed his authorship of the letter sent to the First Department in support of Guran's request for an adjournment of his disciplinary committee hearing. He explained that his opinion that Guran was "virtually incapacitated" related primarily to his patient's inability to travel frequently between his home in Florida and New York, as he understood would be required to participate in the disciplinary hearing. As the doctor explained, Guran's ailments gave him a poor sense of balance and made him susceptible to falls. Frequent travel heightened this risk. Dr. Cohen was clear, however, in stating that Guran's problems had not affected his mental capacities and that he had never placed any restrictions on his patient's work activities. He explained that the inability to

---

4. Marvin Skedelsky did represent petitioner on that occasion.

5. Indeed, it is the same counsel who pursues these claims on petitioner's behalf before this court.

concentrate noted in his letter related primarily to difficulty he perceived Guran would have focusing on other matters if he were in a situation where it was difficult for him to keep his balance.

Also testifying at the hearing were Marvin Skedelsky, Esq. and Victor Knapp, Esq., both of whom stated that Guran had approached them about assisting in Bellamy's defense. Knapp was unable to do so because of his representation of co-defendant Pappy Mason. He did recall one conversation with Guran during the *Bellamy* trial during which counsel had a "few second" memory lapse. Skedelsky acknowledged originally telling Guran that he would be available to assist him during the *Bellamy* trial. When Guran tried to reach him at the time of trial, however, Skedelsky was committed elsewhere. Petitioner's mother testified to her impression that Guran was tired and weak during the trial and that her statements to him were not "sink[ing] in."

Further adduced at the hearing was evidence that Guran had been given, prior to the commencement of the suppression hearing in the *Bellamy* case, a copy of a police report detailing the confidential informant interview conducted by Detective Waddell before he spoke with petitioner, and a copy of Bellamy's prior criminal history. It was also established that prior to trial Guran had been given notes of contacts between law enforcement officials and Larry Robinson.

Neither Guran nor petitioner testified at the hearing.[6] Although counsel for Bellamy sought to call Guran, then in Florida, the request was denied by the court.

In a written memorandum and order dated January 31, 1989, the court denied petitioner's motion to vacate his conviction. *People v. Bellamy*, Ind. No. 5382–85

(Queens Co., Sup.Ct. Jan. 31, 1989). It first rejected the contention that trial counsel was not mentally or physically able to conduct the trial.

There was no evidence of mental or emotional aberrations in his handling of this case nor [were] there any signs of physical incapability. It is true that counselor required the use of a cane, but that is far from the physical disability contemplated in the above cases. As to the fact that he exhibited marks of fatigue and appeared tired, these symptoms could not be considered unusual in a three-week case involving a charge of murder.

Dr. Cohen's letter was viewed simply as a document "to secure an adjournment of counsel's pending disciplinary action until Guran could regain his emotional equilibrium." The court was satisfied that the passage of two months between the time of the letter and the trial had permitted counsel to do that to a considerable extent.[7] The court similarly dismissed the post-verdict claims of petitioner and his mother about Guran's trial performance in light of their failure to raise the issue during the trial.

The court further rejected as legally unsupported Bellamy's claim that the trial court was obliged to inquire as to his awareness that his attorney was facing suspension on grounds of incapacity. Bellamy's claims that his lawyer's incompetence was evidenced by his failure to cite *People v. Bartolomeo*, 53 N.Y.2d 225, 440 N.Y.S.2d 894, 423 N.E.2d 371 (1981), in support of his motion to suppress his statements, and his failure to move earlier for the suppression of the Robinson statement, were dismissed as without merit.

### 5. *Appellate Review*

Bellamy sought leave to appeal the denial of his 440 motion to the Appellate Divi-

---

**6.** Bellamy did submit an affidavit in support of his motion, stating *inter alia* that Guran looked ill during the trial and had little energy.

**7.** In the weeks immediately preceding Dr. Cohen's letter, Guran was tested for possible amyotrophic lateral sclerosis, a form of non-infectious polio commonly referred to as Lew Gehrig's Disease. This possibility was only ruled out in late October. Although, according to Dr.

Cohen's testimony, Guran's physical condition did not improve between the fall of 1986 and January 1987, the mere fact that he was concerned about a possibly life-threatening disease in October 1986, and had had these fears assuaged by January 1987, is of some significance in assessing such issues as the lawyer's "ability to concentrate."

sion. Indeed, he argued that he was entitled to such an appeal as of right, and that those New York statutes that authorize only permissive appeal are unconstitutional. The latter argument was rejected by the Appellate Division on April 16, 1990, in a decision that also affirmed Bellamy's conviction on direct appeal. *People v. Bellamy*, 160 A.D.2d 886, 554 N.Y.S.2d 320 (2d Dep't 1990). Therein, the court further upheld the trial court's refusal to suppress Bellamy's statements to the authorities finding that the statements "were not the result of custodial interrogation," and that, in any event, Bellamy had failed to establish that he was, in fact, represented by counsel at the time the statements were made. *Id.* The court did, however, remand the case for resentencing in light of the trial court's failure to state its reasons for imposing a term of imprisonment greater than originally imposed.[8]

On May 9, 1989, the Appellate Division summarily denied Bellamy's petition for leave to appeal from the trial court's denial of his 440 petition. *People v. Bellamy*, Ind. No. 5382–85 (N.Y.App.Div., 1st Dep't May 9, 1989).

Leave to appeal from the affirmance of his conviction was also summarily denied by the Court of Appeals. *People v. Bellamy*, 76 N.Y.2d 784, 559 N.Y.S.2d 989, 559 N.E.2d 683 (1990).

*Discussion*

### I. *Exhaustion of Remedies*

■ A federal district court may only reach the merits of a petition for habeas corpus pursuant to 28 U.S.C. § 2254 if the state prisoner has first exhausted all available state avenues of review. *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982); *Asherman v. Meachum*, 932 F.2d 137 (2d Cir.1991); *Petrucelli v. Coombe*, 735 F.2d 684, 687 (2d Cir.1984). To satisfy this requirement, petitioner must have fairly presented for the state court's consideration both the same factual bases and legal premises as are at issue in his federal petition. *See, e.g., Picard v. Connor*, 404 U.S. 270, 276–77, 92 S.Ct. 509, 512–13, 30 L.Ed.2d 438 (1971); *Asherman v. Meachum, supra.*

■ Respondent here urges dismissal claiming that Bellamy's failure to present his ineffective assistance claim on direct appeal reflects non-exhaustion. This court disagrees. The record amply supports the conclusion that the ineffectiveness claim was more properly addressed through a 440 motion, which Bellamy did pursue, rather than on direct appeal. The 440 court did, after all, order an evidentiary hearing to resolve the claim. Had the matter been capable of resolution on the trial record, the 440 court would have been required, under New York law, to dismiss the petition, not hold a hearing. *See* N.Y.Crim. Proc.Law § 440.10(2)(c); *People v. Satterfield*, 66 N.Y.2d 796, 497 N.Y.S.2d 903, 488 N.E.2d 834 (1985); *Cappiello v. Hoke*, 698 F.Supp. 1042, 1052 (E.D.N.Y.1988), *aff'd*, 852 F.2d 59 (2d Cir.1988). Accordingly, this court finds that, once Bellamy's motion seeking leave to appeal the denial of his 440 motion was denied, he had done all that could reasonably be expected to present his claim to the state courts. *See Klein v. Harris*, 667 F.2d 274, 283–84 (2d Cir.1981) (denial of leave to appeal from 440 denial fully exhausts state remedies). This court proceeds to the merits.

### II. *Ineffective Assistance of Counsel*

Bellamy raises various constitutional challenges to his conviction all stemming from his contention that retained counsel, Sidney Guran, did not provide him with the sort of representation contemplated under the sixth amendment. Thus, Bellamy claims that the record reveals both a *per se* denial of the right to counsel and ineffective representation pursuant to the standard articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He further contends that the trial court denied him due process in failing to conduct a pretrial inquiry into his counsel's competence and in failing to require Guran to testify in the 440 hearing.

---

**8.** It was on remand that the trial court imposed the fifteen-years-to-life term of incarceration for the murder conviction that petitioner is presently serving.

## A. *Alleged "Per Se" Violation*

The sixth amendment to the Constitution guarantees an accused person the right to effective assistance of counsel at all critical stages of a criminal proceeding. U.S. Const. amend. VI; *Strickland v. Washington,* 466 U.S. 668, 684–86, 104 S.Ct. 2052, 2062–64, 80 L.Ed.2d 674 (1984); *United States v. Novak,* 903 F.2d 883, 886 (2d Cir.1990).

When a defendant who has been represented by counsel challenges his conviction on sixth amendment grounds, he generally bears the heavy burden of establishing both that the alleged deficiencies in his counsel's performance caused the representation afforded to fall below an objective standard of reasonableness, *Strickland v. Washington,* 466 U.S. at 688, 104 S.Ct. at 2064, and that, but for counsel's errors, there is a reasonable probability that the outcome of the trial would have been different, *id.* at 694, 104 S.Ct. at 2068.

In a small category of cases, the Second Circuit has found represented defendants denied sixth amendment protection even absent evidence satisfying either prong of the *Strickland* standard. These *"per se"* violations have, however, generally been limited to cases where (1) unbeknownst to the defendant, his lawyer "was not authorized to practice law in any state," *see, e.g., Solina v. United States,* 709 F.2d 160, 167 (2d Cir.1983); *accord United States v. Novak,* 903 F.2d 883 (2d Cir.1990) (lawyer who gains admission to the bar by fraudulently representing his qualifications to practice treated as one who has never been duly admitted); or (2) counsel was himself involved in criminal conduct akin to that for which his client was being tried, *see, e.g., United States v. Cancilla,* 725 F.2d 867, 870 (2d Cir.1984).

Petitioner urges the extension of the *per se* rule to his case, arguing that his attorney had represented himself mentally and physically incapable of participating in court-related matters only two months before his trial; was in fact suspended two months after his trial on the basis of his representations; and had misled the state courts into thinking that he would not try petitioner's case by himself.

These facts do not, however, fit within the confines of the two rationales generally cited to support findings of *per se* violations of the sixth amendment. The first rationale is jurisdictional and pertains to lawyers not duly admitted to practice. It derives from the Supreme Court's holding in *Johnson v. Zerbst,* 304 U.S. 458, 468, 58 S.Ct. 1019, 1024, 82 L.Ed. 1461 (1938), that a defendant's failure to be represented by counsel constitutes "a jurisdictional bar to a valid conviction...." Although Judge Friendly, writing for the Circuit in *Solina,* labelled this a "somewhat surprising thesis," *Solina v. United States,* 709 F.2d at 169, he found no principled grounds to distinguish the jurisdictional point as between total absence of representation and representation by an individual not duly licensed to practice.

This case does not present such a jurisdictional problem. Trial counsel had been duly admitted to practice law in New York for forty years before petitioner's trial. Admittedly, counsel was the subject of disciplinary proceedings at the time of Bellamy's trial. Further, he had managed to delay those proceedings by citing to his own mental and physical ailments. But at the time of trial, the state court had neither suspended counsel nor even sought to limit his practice of law. Absent any such action, the mere fact of disciplinary proceedings is not enough to evidence a *per se* violation of the sixth amendment. *See generally Waterhouse v. Rodriguez,* 848 F.2d 375 (2d Cir.1988) (no *per se* violation in representation by lawyer who is subject of disciplinary proceeding until lawyer actually suspended and receives notice of same).

The second rationale for finding a *per se* violation of the sixth amendment applies both to those cases where counsel was not duly licensed and those cases where counsel was involved in the misdeeds of his client. In both situations, courts have expressed concern that a lawyer's duty vigorously to represent his client might be compromised by his fear that the prosecutor or trial judge would inquire into his back-

ground and there discover that he was acting in violation of the law. *See Solina v. United States,* 709 F.2d at 164; *accord United States v. Novak,* 903 F.2d at 890.

In this case, however, trial counsel had no reason to think that forceful advocacy would expose him to criminal liability or any other sanction. The charges giving rise to the pending disciplinary proceeding were unrelated to his representation of Bellamy. Indeed, the very nature of the charges may have provided counsel with a particular incentive to represent Bellamy with force and vigor. *See Waterhouse v. Rodriguez,* 848 F.2d at 383; *see also United States v. Aiello,* 900 F.2d 528, 532 (2d Cir.1990) (*per se* rule inapplicable to case of duly admitted lawyer under investigation for criminal conduct wholly unrelated to charges on which client stands trial).

Despite the absence in this case of either basis relied on by the courts to support findings of *per se* sixth amendment violations, petitioner nevertheless seeks to analogize his situation to that at issue in *United States v. Novak, supra.* Therein, the court found a *per se* violation of the sixth amendment in a defendant's representation by an attorney who had *secured* admission to the bar by misrepresenting his qualifications. Bellamy argues that here counsel *retained* membership in the bar by misrepresenting that he would not try petitioner's case alone. The two situations are not as neatly parallel as petitioner contends. There is simply no question that without the misrepresentations in the *Novak* case, counsel would never have been admitted to practice. Moreover, because of the misrepresentations there was "no foundation for an assumption that defense counsel had the legal skills necessary to permit him to become a 'duly admitted' member of the bar." *United States v. Novak,* 903 F.2d at 890. In this case, Guran was duly admitted to the bar. In this context, it is far from clear what effect, if any, his subsequent statements had on the Appellate Division, which, after all, took no action on them until well after Bellamy's trial was concluded. Since there is no "conditional admission" to practice law in New York, this court cannot speculate, as petitioner urges,

that counsel would have been suspended but for his representation that he would secure the assistance of other counsel. Moreover, the *Novak* court did emphasize that its *per se* finding was based largely on the possibility that a defendant might have been denied vigorous representation by an attorney who properly feared that a prosecutor or judge might inquire into the circumstances of his admission. The total absence of this concern from this case makes reliance on *Novak* inappropriate.

Of course, the real problem in this case is not so much counsel's statement to the Appellate Division that he would seek the assistance of another lawyer in defending petitioner. It is his statement that he was not physically or mentally capable of participating in disciplinary proceedings. In essence, petitioner is urging this court to find that, because the statement was ultimately relied upon by the state courts to suspend Guran, it is *per se* evidence of ineffectiveness for any representation afforded between the time when it was made and the time when counsel was formally suspended. This the court declines to do, particularly in light of the record, which (1) suggests that Guran's self-serving representations to the Appellate Division about his condition were somewhat overstated, and (2) amply supports the trial court's findings that Guran effectively represented petitioner at trial.

At the 440 hearing, Guran's own doctor stated that his patient's incapacity was primarily physical, not mental. The physical problem was, at one time, thought to be amyotrophic lateral sclerosis, a possibility ruled out only in the fall of 1986. It is conceivable that until Guran's fears in this regard were assuaged he was distracted and unable to concentrate on other matters. But this matter having been resolved some time before trial, there is no basis for thinking Guran unfit to give thoughtful consideration to petitioner's defense.

Indeed, Dr. Cohen stated that the primary reason for labelling Guran incapacitated was his reduced sense of balance, which rendered him particularly susceptible to falls if placed in conditions of frequent

movement as would be the case if Guran had to travel from Florida to New York on a regular basis. Of course, this concern might have been minimized had it been brought more clearly to the attention of the Appellate Division, which could have scheduled its disciplinary hearings on sequential days. Counsel is to be faulted for not raising this possibility, rather than giving the impression of complete incapacitation. To this extent his submission to the Appellate Division may have been exaggerated and misleading. That, however, is not the issue before this court, and is hardly a basis for finding a *per se* violation of the sixth amendment in his representation of petitioner. The fact remains that, after extensive questioning of Guran's treating physician, no evidence was adduced of any mental infirmity. The trial court was entitled to conclude from the hearing evidence, as well as from its own observations of Guran throughout trial, that he was perfectly competent to conduct the defense.

No reviewing court, whether state or federal, enjoys the same first-hand insight as the trial court into counsel's actual performance. A careful review of the entire trial transcript, however, persuades this court that the finding of competency was fully supported by the record. Guran did not limit his defense to any formulistic challenge to the sufficiency of the government's case. He carefully and often shrewdly cross-examined many of the prosecution witnesses. He called numerous witnesses, including the defendant, who was obviously well prepared for his testimony. He gave a summation that was thoughtful, articulate and at times persuasive in its contention that the last person major drug dealers would use to set up a law enforcement officer was a known informant such as Bellamy.

Where a defendant has been represented by duly licensed counsel, where disciplinary proceedings against that counsel have not yet resulted in any adverse ruling, where a hearing on counsel's mental and physical condition at the time of trial amply supports a finding of his mental competence to present a defense, and where the trial record reveals that a defense was advanced

cogently and vigorously, this court finds no basis for concluding that petitioner has sustained a *per se* violation of his sixth amendment right to counsel.

The petition for habeas corpus relief on this ground is denied.

## B. The "Strickland v. Washington" Standard

Petitioner contends that even if this court were not to find a *per se* violation, his counsel's representation fell below the standards set forth in *Strickland v. Washington, supra.* In fact, petitioner's burden of establishing both that his counsel's representation fell below prevailing professional norms and that, but for the errors, a different outcome was likely, is a heavy one. A "strong presumption" operates that counsel's conduct falls within "the wide range of reasonable professional assistance." *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065. In this case, petitioner contends that a factual hearing at which his trial counsel is required to testify is necessary to establish ineffective representation. This court disagrees. The record, whether reviewed in its entirety, *see Kimmelman v. Morrison,* 477 U.S. 365, 386, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986) (generally appropriate to consider counsel's overall performance in assessing an alleged omission), or in light of petitioner's discrete complaints, fails to demonstrate any deficiency sufficient to satisfy *Strickland.*

## 1. Suppression of Petitioner's Statements to the Authorities

Petitioner complains that his trial counsel, in moving to suppress his statements to the authorities should not have argued simply that the statements were involuntary, but should have cited the court to *People v. Bartolomeo,* 53 N.Y.2d 225, 440 N.Y.S.2d 894, 423 N.E.2d 371 (1981), a case holding that when police are aware that a suspect in custody is represented by counsel, albeit on an unrelated charge, they are absolutely precluded by the New York

Constitution from interrogating that individual in the absence of his counsel.[9]

In this case it is clear that invocation of *Bartolomeo* would have made no difference to the outcome of the suppression motion. *Bartolomeo* applies only to custodial interrogations. *See People v. Bartolomeo,* 53 N.Y.2d at 231, 440 N.Y.S.2d at 897, 423 N.E.2d at 374; *cf. People v. Bertolo,* 65 N.Y.2d 111, 116, 490 N.Y.S.2d 475, 479, 480 N.E.2d 61, 65 (1985) (no *Bartolomeo* violation in non-custodial questioning of represented individual). The trial court, however, specifically found that petitioner was not in custody at the time he made the statements at issue. Rather, he voluntarily accompanied the police to the station and spoke with them despite the fact that he was free to leave. This finding was expressly affirmed by the Appellate Division on direct appeal. Such a finding of fact is entitled to a "high measure" of deference by a federal court reviewing the issue on a petition for habeas corpus. *See* 28 U.S.C. § 2254(d) (1988); *Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983). This court's own review of the hearing transcript reveals that the finding is fairly supported by the record, particularly in light of petitioner's background as a police informant.

In this light, it can neither be said that counsel's failure to cite *Bartolomeo* was professionally unreasonable, nor that, but for the failure, the petitioner's statements would likely have been suppressed.

2. *Suppression of Petitioner's Statement to Robinson*

■ Bellamy further claims that his trial counsel's failure to move to suppress his statement to Larry Robinson before trial constituted ineffective assistance in light of *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). As the record demonstrates, counsel did invoke *Maine v. Moulton* after Robinson testified to support a motion to strike his testimony or, in

the alternative, grant a mistrial. Thus, the issue before the court is not whether the failure to make the motion altogether constituted ineffective assistance, but whether the failure to raise it sooner denied petitioner rights secured by the sixth amendment. This court finds that the motion was unlikely to succeed at any time and therefore that its tardy presentation did not constitute a sixth amendment denial.

In *Maine v. Moulton, supra,* the Supreme Court held that the procurement of a defendant's post-indictment statement by the active use of a government informant must be suppressed as violative of the sixth amendment. In this case, Robinson's own trial testimony revealed that he was not an informant at the time he spoke to Bellamy. Only after their meeting did he have his lawyer approach the prosecutors in an effort to exchange his information for better treatment on his own case. This scenario would not demonstrate "knowing exploitation by the State of an opportunity to confront the accused" in the absence of his counsel. *See Maine v. Moulton,* 474 U.S. at 176, 106 S.Ct. at 487; *accord United States v. Cruz,* 785 F.2d 399, 408 (2d Cir.1986) (no sixth amendment violation where proof demonstrates that government did not put informant on same floor as indicted defendant for purpose of eliciting information from him).

There being no basis to conclude that a motion to suppress Robinson's statements would have been any more likely to succeed pretrial than when raised in the midst of trial, the court finds no sixth amendment denial.

C. *Due Process Denials*

Bellamy contends that due process imposed upon the trial court an independent duty to inquire into counsel's competency and, indeed, to order either his withdrawal from the case or the appointment of additional counsel. In support of this argument he cites various cases discussing a

---

**9.** Petitioner contends that the police should have known that he had been arrested only a short time before the October 25, 1985 interview. Not insignificantly, *Bartolomeo* has re-

cently been overruled by the New York Court of Appeals. *See People v. Bing,* 76 N.Y.2d 331, 559 N.Y.S.2d 474, 558 N.E.2d 1011 (1990).

trial court's obligation to ensure representation consistent with the sixth amendment when it is made aware of a possible conflict of interest. *E.g., Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). Although this court agrees that further inquiry prior to trial would have been appropriate in this case,[10] it does not conclude, in light of the findings made at the 440 hearing, that due process was here denied.

■ Preliminarily, the court notes that the trial court was plainly aware, by virtue of an *ex parte* communication from Sidney Guran himself that counsel's medical condition was the basis for a pending motion to suspend him from the practice of law. *Cf. Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (court not required to inquire into conflicts of which it is unaware). Under such circumstances, the court should have taken steps to ensure both (1) that defendant was aware of the situation; and (2) that counsel was sufficiently well to render the sort of representation contemplated by the sixth amendment. The failure to make such inquiry does not, however, by itself, warrant granting habeas corpus relief. *See generally United States v. Edwardo-Franco,* 885 F.2d 1002, 1007 (2d Cir.1989) (failure of court to make proper inquiry of defendants in case of dual representation does not automatically entitle them to new trial; burden shifts to government to show no prejudice). Indeed, in *Wood v. Georgia,* 450 U.S. 261, 274, 101 S.Ct. 1097, 1104, 67 L.Ed.2d 220 (1981), the Supreme Court held that, when a court fails to hold a hearing on the question of conflict, the appropriate relief is a remand to determine whether an actual conflict was indeed present. *Accord Bonin v. California,* 494 U.S. 1039, 1043, 110 S.Ct. 1506, 1508, 108 L.Ed.2d 641 (1990)

(Marshall, J.) (dissenting from denial of certiorari) (trial court's failure to conduct necessary inquiry warrants remand for determination as to whether actual conflict exists).

In this case, no remand is necessary since the state court did ultimately hold a hearing on counsel's competency in conjunction with petitioner's 440 application. Detailed testimony at that hearing from Guran's treating physician, coupled with the trial court's own observations of counsel's performance during trial, established that no physical or mental infirmity prevented Guran from providing petitioner with a thoughtful and vigorous defense. As already noted, this conclusion is amply supported by both the trial and hearing records.

■ Petitioner complains that this hearing record cannot be relied on because the state court refused to order Guran himself to testify. Indeed, petitioner argues that this refusal itself constituted a denial of due process warranting issuance of a writ of habeas corpus.

A serious question exists as to the propriety of entertaining on federal habeas such a challenge to state court collateral review of a conviction. The majority of circuits that have considered the issue have held that such claims are not cognizable pursuant to § 2254. *See, e.g., Conner v. Director of Div. of Adult Corrections,* 870 F.2d 1384, 1386–87 (8th Cir.), *cert. denied,* 493 U.S. 953, 110 S.Ct. 363, 107 L.Ed.2d 350 (1989); *Bryant v. State of Maryland,* 848 F.2d 492, 493 (4th Cir.1988); *Kirby v. Dutton,* 794 F.2d 245, 247–48 (6th Cir 1986); *Vail v. Procunier,* 747 F.2d 277 (5th Cir. 1984) (per curiam). Only the First Circuit has held to the contrary. *See Dickerson v. Walsh,* 750 F.2d 150, 152–54 (1st Cir.1984).

---

10. The trial court, in denying Bellamy's § 440 motion, held that it would not have been appropriate for it to interfere with the relationship between a defendant and retained counsel by ordering either that counsel withdraw or be assisted by another attorney. This conclusion is subject to some question. *See generally Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 1698, 100 L.Ed.2d 140 (1988) (trial court has power to decline proffer of waiver of any challenge to counsel's conflict of interest by jointly represented defendants). In any event, by thus focusing exclusively on Bellamy's claim that substitute or additional counsel should have been ordered, the trial court overlooked the possibility of conducting at least an inquiry to ensure that defendant was aware of the situation and thus able to make informed choices about his counsel.

The Second Circuit has yet to address the issue.

Even if it were appropriate to address the issue on the merits, this court would not find the state court's failure to require the testimony of Guran at the 440 hearing sufficient to constitute a denial of due process. The state court had already observed him throughout a lengthy and complex trial. That observation lent no support to the claim that counsel was too ill or distracted to render competent representation. At the hearing, the court heard from Guran's treating physician. That testimony served to ensure that the lay observations made in the course of trial were not contradicted by medical findings. Petitioner fails to set forth with any particularity what further evidence would have been adduced had Guran testified that would have undermined the factual findings of competency.

Trial counsel's competency having been established at an evidentiary hearing, and that finding being amply supported by the evidence, petitioner's due process challenge to his conviction is dismissed as without merit.

### Conclusion

Bellamy's claim that his conviction was obtained in violation of his rights to effective representation of counsel and due process is without merit. Accordingly, his petition for habeas corpus relief is denied. The court does, however, grant a certificate of probable cause to appeal.

*SO ORDERED.*