Perry **BELLAMY**, Petitioner–Appellant,

v.

William **COGDELL**, Warden, Brooklyn House of Detention, Respondent–Appellee.

No. 438, Docket 91–2327.

United States Court of Appeals, Second Circuit.

Argued Before the In Banc Court: June 1, 1992.

Decided Sept. 8, 1992.

Michael A. Ciaffa, Mineola, N.Y. (Meyer, Suozzi, English & Klein, P.C., of counsel), for petitioner-appellant.

Barbara D. Underwood, Asst. Dist. Atty. for Queens County, Kew Gardens, N.Y. (Richard A. Brown, Dist. Atty. Tammy J. Smiley, and Seymour Roth, Asst. Dist. Attys., Queens County, of counsel), for respondent-appellee.

Before: MESKILL, Chief Judge, FEINBERG, OAKES, NEWMAN, KEARSE, CARDAMONE, WINTER, PRATT, MINER, ALTIMARI, MAHONEY, WALKER, and McLAUGHLIN, Circuit Judges.

ALTIMARI, Circuit Judge:

We granted rehearing *in banc* to consider whether petitioner-appellant Perry Bellamy suffered a *per se* denial of his right to counsel under the Sixth Amendment. The parties were also invited to brief the application of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) to this habeas corpus proceeding. These issues arise from Bellamy's appeal from a judgment entered in the United States District Court for the Eastern District of New York, (Reena Raggi, *Judge*), denying Bellamy's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1988).

In a well-reasoned opinion, Judge Raggi rejected Bellamy's claims that he was denied: (1) effective assistance of counsel, either under a *per se* rule or under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); (2) due process; and (3) a full and fair opportunity to litigate his attorney's competence at a state court hearing held in connection with his motion to set aside his conviction pursuant to N.Y.Crim.Proc.L. Art. 440 (McKinney 1983). *Bellamy v. Cogdell*, No. 90–4245, — F.Supp. —, 1991 WL 377837 (E.D.N.Y. June 28, 1991).

A divided panel of this court reversed the judgment of the district court, concluding that Bellamy suffered a *per se* denial of his Sixth Amendment right to counsel. *Bellamy v. Cogdell*, 952 F.2d 626 (2d Cir.1991). On *in banc* review, we agree with the district court and hold that our narrowly crafted *per se* rule does not apply to the facts of this case. We therefore vacate the panel opinion and affirm the judgment of the district court.

## BACKGROUND

The facts in this case are largely undisputed. In January 1987, Bellamy went on trial in New York Supreme Court, Queens County, for his charged participation in the murder of State Parole Officer Brian Rooney. Lorenzo "Fat Cat" Nichols, a notorious Queens drug dealer, ordered Rooney's murder from Nichols' jail cell. This "hit" was a revenge killing for Rooney's efforts in placing Nichols behind bars. The state's

evidence at trial showed that, in exchange for $5,000, Bellamy lured Rooney to a park in Queens where associates of Nichols shot Rooney repeatedly as Rooney sat in his car. After almost three weeks of trial, including five days of jury deliberations, a jury convicted Bellamy of second degree murder and second degree criminal possession of a weapon. Bellamy was eventually sentenced to fifteen years to life for the murder conviction and five to fifteen years for the weapon possession conviction, the sentences to run concurrently.

Over one year prior to the start of Bellamy's trial, Bellamy's mother contacted Attorney Sidney Guran to represent Bellamy. Although Guran was then retired and living in Florida, he had represented Bellamy numerous times in the past and agreed to represent him again. At that time, Guran was seventy-one years old and had been a duly admitted and successful member of the bar for almost fifty years.

In the months preceding and during Bellamy's trial, Guran was the subject of disciplinary proceedings in the Appellate Division, First Department. In October 1986, the Departmental Disciplinary Committee alleged that Guran had converted client funds in 1976 and had negligently handled a real estate transaction in 1977. The Committee scheduled a hearing on these charges for December 11, 1986. On November 10, 1986, Guran's attorney, Richard L. Baltimore, Jr., requested that the hearing be adjourned because more time was needed to compile documents for the hearing and because Guran was then "not mentally capable of preparing for the hearing." Baltimore based his evaluation of Guran's capacity on phone conversations with Guran in which he found "a certain amount of disorientation" and on a letter, dated October 29, 1986, from Guran's physician, Dr. Richard P. Cohen.

According to Dr. Cohen, Guran suffered from a variety of physiological ailments, including a recently diagnosed polyneuropathy, a condition "characterized by peripheral motor weakness [and] unsteadiness" on one's feet. Dr. Cohen had been treating Guran for that condition for the preceding

six weeks. During that time, as a result of the "physical and emotional stress" associated with Guran's recently discovered illness and of certain medications, Guran had been "virtually incapacitated." Dr. Cohen also noted that as a result of that condition, Guran "at times" had "an inability to concentrate." The prognosis for Guran's newly discovered condition was uncertain at that time, but Dr. Cohen "anticipated" that evaluation and treatment of the polyneuropathy would take three to six months, and that Guran would be "effectively incapacitated during that time."

Based on these communications, and on the underlying charges, the Disciplinary Committee filed a notice of petition with the First Department on November 21, 1986 seeking to have Guran suspended immediately and indefinitely from the practice of law. The accompanying petition recounted, among other things, the substance of the letters that Guran's attorney and physician had submitted to the Committee. In response, Guran submitted an affidavit to the First Department dated December 12, 1986, in which he admitted his medical problems, but stated that a suspension, with its attendant stigma, was unnecessary. According to Guran, he had been essentially retired since 1984, having taken on no new work except for Bellamy's case. Because of his prior representation of Bellamy and because of his familiarity with the case, Guran requested that he be permitted to represent Bellamy, stating:

I, of course, will not attempt to try this case by myself. I will have a competent attorney, but I must be present to assist him. Bellamy relies on, and strictly trusts only me and his mother has paid me. It would be a complete disservice to this defendant and jeopardize his right to a fair trial if I were not permitted to assist in his trial and defense.

Neither the Disciplinary Committee nor the First Department ever responded to Guran's affidavit.

On December 11, 1986, Guran also advised the trial judge, John T. Gallagher, in an *ex parte* submission, about the pending disciplinary charges and his attendant health problems. Among other things, Guran informed Judge Gallagher:

You might remember that I had a Dr. [sic] appointment ... at N.Y. Hospital at which time a tentative diagnosis of [a form of polio commonly known as Lou Gehrig's Disease] was made. Needing time to prepare [for the disciplinary hearing scheduled for December 11, 1986], feeling miserable, [and] discouraged, I returned home and, through my lawyer, sent a copy of my medical statement to the Committee. Immediately they moved to suspend me pending my recovery....

I am feeling better and have secured the services of Marvin D. Skedelsky, Esq. [to assist me with the trial].

Jury selection in Bellamy's trial began on January 6, 1987. Although Skedelsky told Guran that he would be available to assist Guran at trial, Skedelsky was unexpectedly occupied with another case when Bellamy's trial commenced. As a result, Guran represented Bellamy alone. At no time was Bellamy informed of Guran's disciplinary or health problems. On January 24, 1987, after almost three weeks of trial including five days of deliberations, the jury convicted Bellamy of second degree murder and second degree criminal possession of a weapon.

On March 26, 1987, more than two months after Bellamy's conviction, the First Department—without a hearing—suspended Guran from the further practice of law. The First Department chose to suspend Guran based on his representation made over three months earlier in December 1986 that his then-existing state of health prevented him from preparing for his disciplinary hearing.

Having learned that Guran had been suspended, Bellamy, represented by pro bono counsel, moved in June 1987 pursuant to N.Y.Crim.Proc.L. Art. 440 (McKinney 1983) to vacate his judgment of conviction. Among other things, Bellamy claimed that he was not afforded effective representation due to Guran's alleged incapacity and his subsequent suspension on that ground. Alternatively, Bellamy requested that a

hearing be held to determine Guran's competency. On July 30, 1987, Judge Gallagher denied Bellamy's Art. 440 motion and his request for a hearing, ruling from the bench that:

> He [Guran] did an excellent job in trying that case. I don't know of any mistakes that he made in trying the case.
>
> Further, with respect to the Appellate Division, Mr. Guran came to me before he started this case. He told me that he had a matter pending before the Appellate Division. This was with the First Department. *I called the First Department and I told them that Mr. Guran was in my court and he had a matter to try here and I asked if it was appropriate for me to permit him to try this case, and they told me that it was permissible for me to do that and that's exactly what I did and I did it at Mr. Guran's request. He knew exactly what I was doing....* [S]o there's no impropriety with respect to Mr. Guran's conduct or how he tried the case.... (emphasis added).

Upon Bellamy's motion for reconsideration, the court ordered a hearing to determine the competency of trial counsel. Neither Guran nor Bellamy testified at the Art. 440 hearing. The principal witness at the hearing was Dr. Cohen. Dr. Cohen first testified about his authorship of the October 29, 1986 letter, written at Guran's request, that was sent to the First Department in support of Guran's efforts to secure an adjournment of the disciplinary hearing. With regard to the October letter, Dr. Cohen testified essentially that:

> [H]is opinion [in the October letter] that Guran was "virtually incapacitated" related primarily to his patient's inability to travel frequently between his home in Florida and New York, as he understood would be required to participate in the disciplinary hearing. As the doctor explained, Guran's ailments gave him a poor sense of balance and made him susceptible to falls. Frequent travel heightened this risk.... He explained that the inability to concentrate noted in his letter related primarily to difficulty he perceived Guran would have focusing on

other matters if he were in a situation where it was difficult for him to keep his balance.

*Bellamy v. Cogdell,* 1991 WL 377837, —— F.Supp. —— (E.D.N.Y.1991). Significantly, based on a follow-up examination conducted on January 6, 1987—the day Bellamy's trial commenced and over two months after the October letter was written—Dr. Cohen further testified that he placed no restrictions on Guran's practice of law and, more importantly, stated unequivocally that Guran's physical problems had no effect on his mental capacities, *i.e.,* there was nothing wrong mentally with Guran at the time of Bellamy's trial. After the evidentiary hearing, the trial court again denied Bellamy's motion to vacate his conviction, finding that at the time of trial, Guran "was mentally and physically capable to try the defendant's case and did so in a competent manner." *People v. Bellamy,* Ind. No. 5382–85 (Queens Co.Sup.Ct. Jan. 31, 1989).

The Appellate Division denied Bellamy's petition for leave to appeal from the trial court's denial of his Art. 440 motion. *People v. Bellamy,* Ind. No. 5382–85 (2d Dep't May 9, 1989). Thereafter, the Appellate Division affirmed Bellamy's conviction on the merits and, in the course of the opinion, rejected his argument that he was entitled to an appeal as of right from the denial of his § 440 motion. *People v. Bellamy,* 160 A.D.2d 886, 554 N.Y.S.2d 320, 321 (2d Dep't 1990). The Court of Appeals summarily denied Bellamy's petition for leave to appeal the affirmance of his conviction. *People v. Bellamy,* 76 N.Y.S.2d 784, 559 N.Y.S.2d 989, 559 N.E.2d 683 (1990).

After exhausting state court remedies, Bellamy filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York reiterating the arguments raised in his Art. 440 motion, including the claim that he was denied effective assistance of counsel under a *per se* rule or under the actual prejudice standard of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Bellamy also claimed that he was denied a full and fair opportu-

nity at the state court hearing to litigate the issue of Guran's competence, or, consequently, the issue of actual prejudice, because the court declined his request to compel Guran's attendance at the hearing.

After submission of legal memoranda, the district court rejected these claims and denied and dismissed Bellamy's habeas corpus petition without an evidentiary hearing. In a well-reasoned opinion, the court held that the *per se* rule did not apply under the facts of this case and that Guran's representation was not deficient under the *Strickland* standard. The district court further concluded that although Guran did not testify, the testimony of Guran's treating physician concerning Guran's mental competence and the favorable observations of the trial judge regarding Guran's overall mental acuity and physical vigor during almost three weeks of trial were adequate to determine Guran's competency. The court therefore determined that another hearing on the issue of Guran's competence, or on whether Bellamy was prejudiced by Guran's representation, was unnecessary, particularly in light of Bellamy's "fail[ure] to set forth with any particularity what further evidence would have been adduced had Guran testified that would have undermined the factual findings of competency." After thoroughly reviewing the record, the district court, agreeing with the trial court, found that there was "no evidence ... of any mental infirmity" of Guran at the time of trial that impeded his ability to present a defense, and that Guran in fact conducted a vigorous defense.

Bellamy, again represented by pro bono counsel, appealed to this court, reiterating the claims made to the district court. A divided panel reversed the district court, holding that on the facts of this case, Bellamy suffered a *per se* denial of his Sixth Amendment right to counsel. 952 F.2d 626 (2d Cir.1991). A majority of the active judges of the court then voted to grant the State's petition to rehear the case *in banc*.

## DISCUSSION

The principal issue on appeal is whether under the facts of this case Bella-

my suffered a *per se* denial of his Sixth Amendment right to counsel. In the ordinary case, a defendant raising a claim of ineffective assistance of counsel bears the heavy burden of establishing that his "counsel's representation fell below an objective standard of reasonableness" and that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. at 2064, 2068. However, in certain Sixth Amendment contexts involving the "[a]ctual or constructive denial of the assistance of counsel," prejudice is presumed. *Id.* at 692, 104 S.Ct. at 2067.

This court has found such *per se* violations in two limited circumstances: where, unknown to the defendant, his or her counsel was, at the time of trial (1) not duly licensed to practice law because of a failure ever to meet the substantive requirements for the practice of law, *see United States v. Novak*, 903 F.2d 883, 890 (2d Cir.1990) (counsel fraudulently procured license by misrepresenting that he was entitled to a special dispensation from the bar examination); *Solina v. United States*, 709 F.2d 160, 167 (2d Cir.1983) (counsel repeatedly failed the bar exam and was not a member of any bar) or (2) implicated in the defendant's crimes, *see United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir.1984). Even on these occasions, we have applied the *per se* rule "without enthusiasm." *United States v. Aiello*, 900 F.2d 528, 532 (2d Cir.1990).

We have advanced two rationales for applying the *per se* rule. The first is "jurisdictional" and applies in cases where the attorney is not duly licensed at the time of trial. It stems from the Supreme Court's decision in *Johnson v. Zerbst*, 304 U.S. 458, 468, 58 S.Ct. 1019, 1024, 82 L.Ed. 1461 (1938), that the failure to provide a criminal defendant with counsel created "a jurisdictional bar to a valid conviction." *See Solina*, 709 F.2d at 168–69 (discerning no meaningful distinction between total absence of representation and representation by unlicensed counsel). The second ratio-

nale is based on notions of conflict of interest, and applies in cases both where the lawyer is not duly licensed, *see Novak*, 903 F.2d at 890; *Solina*, 709 F.2d at 164, and where the lawyer is implicated in the crimes of his or her client, *see Cancilla*, 725 F.2d at 870. In these circumstances, the defense is necessarily compromised because the advocate ordinarily "cannot be wholly free from fear of what might happen if a vigorous defense should lead the prosecutor or the trial judge to inquire into his [or her] background and discover his [or her] lack of credentials[,]" *Solina*, 709 F.2d at 164, or own wrongdoing. Regardless of the facts presented, application of the *per se* rule must be justified under one or both of these rationales. *See Aiello*, 900 F.2d at 532.

■ Against this backdrop, we turn to the merits of Bellamy's claim. Relying primarily on *Novak*, Bellamy contends that this case falls within the narrow confines of our *per se* rule. In *Novak*, we found a *per se* violation of defendant's Sixth Amendment right to counsel where counsel had secured admission to the bar by fraudulently misrepresenting to the state that he was eligible for a special dispensation from taking the bar exam. We reasoned that this fraud resulted in a substantive defect in licensure because "there has been no foundation for an assumption that defense counsel had the legal ·skills necessary to permit him to become a 'duly admitted' member of the bar." 903 F.2d at 890. Moreover, because of the attorney's deliberate fraud in obtaining admission, "[t]here remained the underlying risk that a vigorous defense could have led to a deeper probe and a discovery that [the· attorney] had not been 'duly' admitted." *Id.*

Analogizing this case to *Novak*, Bellamy argues that Guran did not *secure,* but· *retained* his license to practice law by misrepresenting that he would not try Bellamy's case alone. According to Bellamy, Guran almost certainly would have been suspended before trial but for this misrepresentation. Bellamy further argues that Guran was prevented from defending Bellamy vigorously ·for fear that his unful-

filled promise to the Appellate Division to secure co-counsel would have been discovered. Bellamy's arguments are unpersuasive.

Unlike the attorney in *Novak*, who was never duly admitted to the bar and certainly, not hypothetically, would not have been admitted without his fraudulent misrepresentation, Guran was fully, not conditionally, admitted to practice for almost fifty years at the time of Bellamy's trial and there is no basis to recast reality and treat him as if he were not. Moreover, it is unclear what effect, if any, Guran's representation had on the timing of his suspension by the Appellate Division. Not only did the Appellate Division never respond to Guran's affidavit, but Guran was not suspended until over two months after Bellamy's trial, and his suspension was prospective.

In addition, Guran's unfulfilled representation to the First Department regarding co-counsel does not approach the type of intentionally fraudulent behavior present in *Novak*. The record indicates that Guran spoke to Attorney Skedelsky on more than one occasion regarding possible collaboration at Bellamy's trial and that Skedelsky promised Guran that he would be available. Unfortunately, when Guran called for his assistance, Skedelsky was unexpectedly occupied as a result of a last minute scheduling conflict and Guran tried the case alone. Thus, there is no record evidence that Guran intentionally misrepresented that he would secure co-counsel.

Furthermore, although the record is not clear regarding whether Guran informed the trial judge of his promise to the Appellate Division to secure co-counsel, the record plainly reveals that Guran informed the court of his pending disciplinary hearing, of his possible immediate suspension for health reasons, and of his intended collaboration with Attorney Skedelsky. Indeed, at Guran's request, the trial judge contacted the Appellate Division shortly before trial to inquire whether Guran could represent Bellamy at trial and was told that he could. The judge also obviously knew that Guran represented Bellamy

alone. Under these circumstances, it cannot be said that Guran's conduct approached the egregious deceptive behavior of counsel in *Novak, Solina,* or *Cancilla,* who in no way apprised the court that they were, respectively, unlicensed or implicated in their client's wrongdoing. *See Aiello,* 900 F.2d at 531 (refusing to extend *per se* rule " 'beyond the sort of egregious conduct present in *Solina* and *Cancilla.*' ") (citation omitted).

For similar reasons, it cannot be said that Guran was prevented from mounting a robust defense because he had something to hide. The petition to suspend Guran pending in the First Department at the time of Bellamy's trial was based on Guran's alleged ill health, not on any promise to secure co-counsel. As discussed above, Guran informed the court of his situation. Compared to counsel in *Novak, Solina,* and *Cancilla,* Guran had no skeletons in his closet giving rise to a conflict of interest that would have inhibited him from defending Bellamy vigorously. Indeed, the record indisputably reflects that Guran provided vigorous, competent advocacy on Bellamy's behalf.

■ Bellamy further contends that statements of mental incapacity made by Guran to the First Department in connection with his efforts to postpone his disciplinary hearing provide an alternative basis upon which to apply the *per se* rule. This contention is unavailing as a matter of policy and on the facts of this case.

As the Supreme Court has recently observed, "[p]er se rules should not be applied ... in situations where the generalization is incorrect as an empirical matter; the justification for a conclusive presumption disappears when application of the presumption will not reach the correct result most of the time." *Coleman v. Thompson,* — U.S. ——, ——, 111 S.Ct. 2546, 2558, 115 L.Ed.2d 640 (1991). Unlike the situation presented by the "phony" attorneys in *Novak* and *Solina,* or by the attorney involved in his client's crimes in *Cancilla,* there is simply nothing inherent in an attorney's illness that necessarily will impede a spirited defense "most of the time"

to justify finding the attorney's representation *per se* ineffective. Rather, given the varying effects health problems can have on an individual's ability to function, claims of ineffective assistance based on attorney illness are best suited to the fact-specific prejudice inquiry mandated by *Strickland.*

Furthermore, in the instant case, an Art. 440 hearing was held specifically to probe the issue of Guran's competence to represent Bellamy in order to resolve Bellamy's claim that he was denied effective assistance of counsel because of Guran's ill health. The evidence adduced at the hearing through the testimony of Guran's physician—based on an examination of Guran the day Bellamy's trial commenced—clearly demonstrated that Guran had no mental incapacity at the time of trial. This medical evidence was consistent with the trial judge's own favorable observations of Guran's mental and physical condition during the almost three week trial. Although Guran did not testify at the Art. 440 hearing, the testimony of Guran's physician, which was subject to extensive cross-examination, together with the testimony of lay witnesses Skedelsky, Victor Knapp (another attorney whom Guran approached on one occasion regarding possible collaboration) and Bellamy's mother, afforded Bellamy a full and fair opportunity to litigate the issue of Guran's competence. Given the evidence, Guran's testimony would have been of little value.

After the hearing, the state court found that at the time of trial, Guran "was mentally and physically capable to try the defendant's case and did so in a competent manner." Following a careful review of the record, the district court concluded that the state court's finding was amply supported by the evidence.

Because Bellamy had a full, fair, and adequate Art. 440 hearing, and because the district court concluded that the state court's factual determination regarding Guran's competence was supported by the record, the district court properly deferred to the state court's factual finding, *see* 28 U.S.C. § 2254(d); *Sumner v. Mata,* 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71

L.Ed.2d 480 (1982) (per curiam) (§ 2254(d) "requires the federal courts to show a high measure of deference to the factfindings made by the state courts."); *Ventura v. Meachum*, 957 F.2d 1048, 1054 (2d Cir. 1992), and was well within its discretion not, to hold an evidentiary hearing on this same issue. *See, e.g., Townsend v. Sain*, 372 U.S. 293, 318, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963), *overruled on other grounds, Keeney v. Tamayo–Reyes*, —— U.S. ——, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992); *Tate v. Wood*, 963 F.2d 20, 24 (2d Cir.1992). Under these circumstances, Bellamy's reliance on Guran's alleged incapacity as a ground for applying the *per se* rule is, as a factual matter, unwarranted.

Having concluded that this case does not fall within the ambit of our Sixth Amendment *per se* jurisprudence, we need not address any issues that would be presented by a contrary ruling on the merits. We note that a contrary ruling would arguably constitute a "new rule" within the meaning of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and its progeny.

## CONCLUSION

We have considered the remaining claims advanced by Bellamy in support of his petition for a writ of habeas corpus and find them to be without merit. Based on the foregoing, the opinion of the panel is vacated and the judgment of the district court denying and dismissing Bellamy's petition for a writ of habeas corpus is affirmed.

FEINBERG, Circuit Judge (with whom OAKES, JON O. NEWMAN, KEARSE, CARDAMONE and WINTER, Circuit Judges, join), dissenting:

I respectfully dissent. This case should never have been subjected to an in banc hearing. And now that it has been, the majority has reached a result that is inconsistent with our precedents.

*Misuse of the in banc procedure*

Rule 35(a) of the Federal Rules of Appellate Procedure provides that:

(a) **When Hearing or Rehearing in Banc Will be Ordered.** A majority of the circuit judges who are in regular active service may order that an appeal or other proceeding be heard or reheard by the court of appeals in banc. Such a hearing or rehearing is not favored and ordinarily will not be ordered except (1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional importance.

Thus, the Rule cautions that in bancs are "not favored" and "ordinarily will not be ordered except ... to secure or maintain uniformity" or unless the case raises "a question of exceptional importance." Neither condition has been met here.

An in banc proceeding was not necessary to secure or maintain uniformity, a requirement obviously intended to prevent panels from overruling earlier decisions unless a majority of the court agrees. See *United States v. Valencia*, 669 F.2d 37, 38 (2d Cir.1981) (Van Graafeiland, J., dissenting); *United States v. Aguon*, 851 F.2d 1158, 1175 n. 6 (9th Cir.1988) (Reinhardt, J., concurring), overruled on other grounds, *Evans v. United States*, —— U.S. ——, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992). Bellamy's lawyer, Sidney Guran, was faced with the immediate loss of his license—well before Bellamy's trial—because of Guran's own admission to the Appellate Division of incapacity; Guran was allowed to keep his license long enough to try the case only because of a representation that he did not fulfill. The panel that first heard this appeal held that under our precedents in *United States v. Novak*, 903 F.2d 883 (2d Cir.1990); *United States v. Cancilla*, 725 F.2d 867 (2d Cir.1984); and *Solina v. United States*, 709 F.2d 160 (2d Cir.1983), Bellamy thereby suffered a per se denial of his Sixth Amendment right to counsel. *Bellamy v. Cogdell*, 952 F.2d 626 (2d Cir.1991). Obviously, the panel did not attempt to overrule the earlier cases so there is no need for an in banc to secure or maintain uniformity. We have here merely a dispute among the judges of the court as to whether our per se rule does or does not "apply to the facts of this case," as the

majority puts it. Such a disagreement does not justify an in banc. See *In re Drexel Burnham Lambert Inc.*, 869 F.2d 116, 118 (2d Cir.1989) (Miner, J., concurring) (finding standard for in banc review not met when "the panel majority has applied well-settled rules to the specific facts of [the] case" in reaching its decision), cert. denied, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989).

Moreover, much of the difference between the majority and minority involves a resolution of a factual issue that is in no sense appropriate for in banc consideration. The majority finds that Guran had a firm commitment from another lawyer (Marvin D. Skedelsky) to assist him at trial and that Skedelsky was "unexpectedly" unavailable. As stated below, we find no evidence in the record of such a firm commitment by Skedelsky or even of his knowledge of the trial date until the very eve of trial.

Nor does this appeal raise "a question of exceptional importance." There is nothing about the case itself that is exceptionally important unless one takes the position that *any* grant of a writ of habeas corpus is exceptionally important. We have not reached that stage of in banc jurisprudence, and I hope that we never do. This case is a factual sport. I doubt if there will ever be another in which a lawyer: (a) admits mental incapacity, including inability to concentrate; (b) makes this admission to the Appellate Division; (c) promises the Appellate Division that he will get another lawyer to try a criminal case but does not fulfill the promise; (d) makes this promise in response to the Appellate Division's motion (returnable before the commencement of the trial) for the lawyer's immediate suspension; (e) would almost certainly be suspended prior to the criminal trial but for the unfulfilled promise; and (f) is suspended two months after the trial without any further record being made.

In short, the facts of this case are unique and it raises no issue of "exceptional importance." Indeed, the only issues even remotely approaching that threshold are those involving the application of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), to this habeas corpus proceeding. Those issues are whether the panel's decision in this case announced a "new rule" within the meaning of *Teague*, and if so, whether respondent-appellee waived any arguments based upon *Teague* by raising them for the first time in a petition for rehearing after the panel had ruled. The in banc court specifically invited briefing on those issues but the majority does not address them.

In sum, the in banc proceeding here was not required either to maintain uniformity or to decide an issue of exceptional importance. It is clear that the in banc majority simply does not like the result of the panel decision. But an in banc for that reason is contrary to the spirit of FRAP 35. Such misuse of the in banc procedure bodes ill for a court whose filings soared above 4,000 for the first time and whose backlog, despite the devoted efforts of all the judges of the court, rose significantly in the statistical year that ended on June 30, 1992. In the face of such a caseload, the waste of time and effort caused by unnecessary in bancs cannot be justified. See Jon O. Newman, In Banc Practice in the Second Circuit: The Virtues of Restraint, 50 Brook. L.Rev. 365, 382 (1984); Jon O. Newman, In Banc Practice in the Second Circuit, 1984–1988, 55 Brook.L.Rev. 355, 369 (1989).

*The merits of the appeal*

Turning to the merits of the appeal, under most circumstances, when a criminal defendant raises a claim of ineffective assistance of counsel, the defendant must demonstrate both unreasonable representation by the attorney and sufficient prejudice to render the result of the trial unreliable. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In a small class of cases, however, we do not apply *Strickland*'s two-pronged test of ineffective assistance but instead presume that there has been prejudice. The Supreme Court in *Strickland* spoke of such cases when it asserted that "[i]n certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel alto-

gether is legally presumed to result in prejudice." 466 U.S. at 692, 104 S.Ct. at 2067.

Both before and after *Strickland,* we have applied such a presumption in unusual circumstances and held that a defendant had been denied the constitutional right to counsel. In *Solina,* defendant's counsel had never been admitted to practice. In a typically thorough opinion by Judge Friendly, we applied a per se rule even though the representative was trained in law and apparently furnished reasonably competent representation and the evidence against the defendant was so overwhelming that he would almost certainly have been convicted regardless of who had represented him. We held that a defendant's Sixth Amendment right to counsel is violated where, without the defendant's knowledge, "his representative was not authorized to practice law in any state, and the lack of such authorization stemmed from failure to seek it or from its denial for a reason going to legal ability, such as failure to pass a bar examination, or want of moral character." 709 F.2d at 167 (citation omitted). We there concluded that "[a]pplication of a *per se* rule appears to us to be required in a case like this by the teachings of the Supreme Court...." 709 F.2d at 168. We were careful to point out, however, that we did not intimate that simply any technical defect in the licensed status of a defendant's representative would amount to a violation of the Sixth Amendment, 709 F.2d at 167, and we gave several examples.

We next applied a per se rule in *Cancilla.* In that case, the attorney at issue had apparently been licensed, but, unknown to the defendant, had participated in criminal conduct related to the conduct for which defendant was convicted. Despite the lack of proof of prejudice to the defendant, we held there that such participation created a conflict of interest that denied defendant his right to counsel at trial. The reason we presumed prejudice in that instance was that the conflict may have prevented the attorney from vigorously representing the client, for fear of being discovered. *Cancilla,* 725 F.2d at 870. As will be seen below, on the facts of this case we have no

less—and perhaps more—reason to fear inadequate representation.

Two years ago, in *Novak,* we again thoroughly canvassed the subject. The attorney in that case (Joel B. Steinberg), although licensed to practice law during the defendant's trial, had fraudulently obtained his license. In an opinion by Judge Kearse, we reaffirmed the holding in *Solina* and held that the representation at trial constituted per se ineffective assistance of counsel, lack of prejudice notwithstanding. Our reasoning again was that "mere technical defects need not result in *per se* Sixth Amendment violations" but that "serious substantive defects" do. 903 F.2d at 888. We pointed out that in *Solina* there had been "a demonstrated inability to meet the threshold criteria of competence in the law (as in Solina's counsel's failure of the bar examination)...." Id. Similarly, in *Novak,* "[t]he defect in Steinberg's licensure was not simply technical but was instead serious and substantive. At the time of his admission to the bar, Steinberg had not met the State's normal substantive requirements for admission to the New York State Bar. His competence to practice law had never been tested, and he was not entitled to bypass such testing." 903 F.2d at 890.

Our per se rule concerning Sixth Amendment violations is not a rule rooted in the facts of any particular case. As the author of the majority opinion in this case pointed out in *United States v. Aiello,* 900 F.2d 528 (2d Cir.1990), it is a rule applicable whenever a lawyer's relationship with the licensing authorities is such that he is inhibited from conducting a vigorous defense " 'wholly free from fear of what might happen if a vigorous defense should lead the prosecutor or the trial judge to inquire into his background and discover his lack of credentials.' " Id. at 531 (quoting *Solina,* 709 F.2d at 164). As we emphasized in *Aiello,* we do not "limit the *per se* rule exclusively to the precise fact situations found in *Solina* and *Cancilla.* Rather, lest our standards undercut the sensitive relationship between attorney and client, *we repudiate a rigid approach in favor of a consideration of the facts of each case.*" 900 F.2d at 532 (emphasis added).

The facts of this case call for application of our per se rule. Accepting the majority's statement of facts and supplementing it in some respects based upon the record, I think it is clear that because Guran did not have funds to hire other counsel, he made material misrepresentations and omissions that led to his avoiding a suspension and being allowed to try this case by himself. First, he promised the Appellate Division on December 12, 1986, that "of course" he would not try Bellamy's case alone, that he would obtain another attorney to try the case and that he would merely assist that attorney. However, at the time this commitment was made, Guran conceded that he had spent the retainer Bellamy's mother had paid. Thus, how Guran was going to pay to hire other counsel was unclear, which bears on the sincerity of his promise.

In a handwritten letter the day before, Guran had informed the trial judge that he had secured the services of Skedelsky to assist him at trial. However, the letter strongly implied that Guran—not Skedelsky—would be the lead counsel, contrary to the representation Guran made the very next day to the Appellate Division. Moreover, Guran did little to carry out his promise to get Skedelsky to help him, either as "second seat" or as lead counsel. Although Guran mentioned to Skedelsky that he "might" seek his assistance in trying the Bellamy case, Guran never actually requested such assistance until the eve of trial. Skedelsky was thus apparently never informed of the trial date until the last moment and was never asked to make a commitment to be available at a particular time. Notably, Skedelsky was never asked to engage in any preparation to try or otherwise to assist in the case. Indeed, he testified that Guran would have been lead counsel even if he, Skedelsky, had participated. This did not fulfill Guran's promise to the Appellate Division. Also notably, Guran did not ask the trial judge, whom he knew well enough to address as "Jack," to adjourn the trial to a date at which Skedelsky would be available.

The lukewarm efforts to secure a lawyer to "assist" were the result of the fact that Guran, who conceded that he could not repay the retainer if he was unable to try the Bellamy case, apparently did not have funds to retain other counsel. Guran knew this at the time he promised the Appellate Division that he would not try the case alone and would merely assist another attorney, and his promise was thus misleading.

Guran was equally misleading in his dealings with the trial judge. Guran's handwritten letter to the judge did not disclose that his own lawyer had asserted Guran's lack of competence to participate in his own disciplinary proceedings or that Guran would promise the Appellate Division the very next day to obtain other counsel to try the case. And there is nothing in the record to suggest that Guran otherwise informed the judge of these facts. On this record, the call by the trial judge to the Appellate Division would have evoked only an inquiry into whether Guran was still in good standing and would not have triggered a review of the entire file, which would have exposed Guran's misrepresentations.

We note that it is undisputed that at the time of trial, Bellamy knew nothing about the charges against Guran, Guran's admission of incapacity or Guran's representation that he would not attempt to try the case alone. Bellamy has sworn in an affidavit that he would not have allowed Guran to represent him at trial had he known of the facts stated above, and that contention is not disputed. Indeed, according to the affidavit, Bellamy got his first inkling of Guran's situation only at sentencing on April 8, 1987, when the trial judge would not allow Guran to represent Bellamy due to Guran's suspension on March 26.

Contrary to the majority's claim that it is "unclear" what effect Guran's misrepresentations had on his suspension, the only reasonable inference is that the Appellate Division would have suspended Guran immediately or prevented him from trying Bellamy's case if it had known he would not be honoring his promise. Guran admitted his incompetence and falsely promised to take preventive actions for the express purpose of avoiding a suspension. Without making full disclosure, he prevailed upon the trial court to allow him to try the case. It is unrealistic to assume that Guran's

course of conduct did not bring about the desired result, i.e., no suspension and no need to hire another attorney as lead counsel.

I thus believe that this case is governed by our prior decisions. First, we have previously applied a per se rule where a lawyer is not licensed (*Solina*) and where the lawyer obtains a license through misrepresentation (*Novak*). In this case, a lawyer, who had admitted that he did not have the mental capacity to defend himself, avoided immediate suspension and thereby retained his authority to defend someone else only by a promise to the Appellate Division that ultimately went unfulfilled. Had there been no such misrepresentation, Guran's suspension would have taken place before Bellamy's trial and Guran could not have defended him.

Second, can it be doubted that any lawyer (assuming his mind is indeed unimpaired) would not be inhibited in putting on a vigorous defense by a reluctance to have the judge or the prosecutor find out that he was trying the case alone in violation of his promise to the Appellate Division to act only to assist another attorney, a promise given to forestall a suspension order? The inhibition upon Guran arising from fear of disclosure of the true facts was every bit as strong as it is in a case where the lawyer is not licensed at all. Perhaps it was stronger: the unlicensed lawyer fears losing a status he only claims but does not enjoy; on these unique facts, Guran was in jeopardy of losing his duly licensed right to practice, a consequence that in fact befell him once the facts were known.

Even if there has not been a per se violation of the Sixth Amendment, the case should at least be remanded to allow the district court to conduct a hearing under *Strickland.* The state court's failure to permit Bellamy to call Guran as a witness deprived Bellamy of a fair opportunity to develop the record as to the effectiveness of his counsel. The majority makes much of the state court hearing at which Skedelsky, Victor Knapp (another attorney whom Guran approached regarding possible collaboration), Guran's physician and Bellamy's mother testified and concludes that given this evidence "Guran's testimony

would have been of little value." This observation appears to assume the content of Guran's testimony. Moreover, not one of these witnesses could possibly know the answers to the key questions: Did Guran fear that aggressive conduct of the defense might disclose to the prosecutor and the state courts his breach of his promise not to try the case alone, and, if so, did such fear affect his conduct of the defense? Were Guran's half-hearted attempts to obtain the aid of another counsel limited by his financial resources? Was Skedelsky's inability to assist at trial "unexpected to Guran?" Guran might well deny fear of disclosure (or any consequences of it), but Bellamy had a right to question him. It would then be up to the court as finder of fact to assess the credibility of any such denials.

*Conclusion*

I would therefore reverse the judgment of the district court, as the panel did. At the very least, I would remand for a *Strickland* hearing.